91 N.J. Super. 81 (1966)
219 A.2d 200
THE NEW JERSEY SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS, A BODY POLITIC, BY CAPTAIN FRANK TOMASULO, PLAINTIFF,
v.
THE BOARD OF EDUCATION OF THE CITY OF EAST ORANGE, A BODY POLITIC, DEFENDANT, NEW JERSEY SCIENCE TEACHERS' ASSOCIATION, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, AND NATIONAL SOCIETY FOR MEDICAL RESEARCH, INC., A NON-PROFIT CORPORATION OF THE STATE OF MINNESOTA, INTERVENORS.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided April 4, 1966.
*84 Mr. Nicholas Martini for plaintiff (Mr. Sam Weiss, on the brief).
Mr. Charles C. Trelease, amicus curiae, for The American Humane Association.
Mr. Edward Stanton for the Board of Education of East Orange.
Mr. Frank L. Bate for New Jersey Science Teachers' Association and National Society for Medical Research, Inc. (Messrs. Shanley & Fisher, attorneys; Mr. Raymond W. Young, of counsel).
BARRETT, J.C.C.
In this action The New Jersey Society for the Prevention of Cruelty to Animals (S.P.C.A.) under N.J.S.A. 4:22-26 seeks recovery against the Board of Education of the City of East Orange (board) of penalties at the rate of $100 per alleged violation arising primarily out of cancer-inducing experiments conducted by a student in its high school on live chickens. By permission of the court, defendants New Jersey Science Teachers' Association and National Society for Medical Research, Inc. were permitted to intervene as party defendants. The American Humane Association was permitted by the court to participate as amicus curiae.
To my mind, the two primary issues are whether the provisions of N.J.S.A. 4:22-16(a) deny the board any power and discretion to permit high school students to undertake learning experiences involving ostensible pain or suffering of a chicken, and whether the board, by its servants or agents, inflicted unnecessary cruelty or otherwise needlessly mutilated or killed live animals, namely chickens, contrary to the provisions and intendment of N.J.S.A. 4:22-26(a) and (c).
Adopted in 1880, and amended in minor respects in 1915, the statute involved deals, according to its heading, with the prevention of cruelty to animals, and specifies "animal or *85 creature" as including the whole brute creation (N.J.S.A. 4:22-15). The legislative history of the enactment is meager and unrewarding.
The following section, N.J.S.A. 4:22-16, and one which requires construction as to its application to the instant case, reads:
"N.J.S.A. 4:22-16. Construction of article
Nothing contained in this article shall be construed to prohibit or interfere with:
a. Properly conducted scientific experiments performed under the authority of the state department of health. That department may authorize the conduct of such experiments or investigations by agricultural stations and schools maintained by the state or federal government, or by medical societies, universities, colleges and philanthropic institutions incorporated or authorized to do business in this state and having among their corporate purposes investigation into the causes, nature, prevention and cure of diseases in men and animals; and may for cause revoke such authority;
b. The killing or disposing of an animal or creature by virtue of the order of a constituted authority of the state;
c. The shooting or taking of game or game fish in such manner and at such times as is allowed or provided by the laws of this state."
The next section, N.J.S.A. 4:22-17, among other provisions, makes one who inflicts unnecessary cruelty upon a living animal or creature of which he has charge guilty of a misdemeanor, punishable by a fine of not more than $250, or imprisonment for not more than six months, or both, in the discretion of the court.
N.J.S.A. 4:22-26, as to the prohibited acts charged here, in so far as relevant reads:
"A person who shall:
a. Overdrive, overload, drive when overloaded, overwork, torture, torment, deprive of necessary sustenance, or cruelly beat or otherwise abuse or needlessly mutilate or kill a living animal or creature;

* * * * * * * *
c. Inflict unnecessary cruelty upon a living animal or creature of which he has charge or custody or either as owner or otherwise, or unnecessarily fail to provide it with proper food, drink, shelter or protection from the weather; * * *" (Emphasis added)
Broadly stated, plaintiff contends that no one but the State Department of Health can give authority for conducting *86 animal experiments and that the Health Department can grant authority for such experiments only to the entities named in N.J.S.A. 4:22-16 (a). S.P.C.A. argues that it was the intention of the Legislature to limit these experiments solely to the groups mentioned in the section. Therefore, anyone conducting scientific experiments on live animals without authorization from the Department of Health should be subject to the penalties set forth in N.J.S.A. 4:22-26, for the acts constituting cruelty; in other words, scientific experiments, even if properly performed, would per se constitute unnecessary cruelty or needless mutilating or killing. If the court does not accept this position, S.P.C.A. further asserts there was a violation of that section in that there was in fact a needless mutilation or killing and an unnecessary cruelty, as proved by the nature of this particular experiment or the manner in which it was carried out.
Again, broadly stated, defendants assert that N.J.S.A. 4:22-26 does not apply to it, and that, assuming cruelty or mutilation and admitting killing, such acts were not needless and were not unnecessary, considering the purposes and goals of the experiment, and the manner in which it was carried out. In the event defendants' contentions, as just stated, are not upheld, they argue that other defenses arise, such as the unconstitutionality of the statute.
My first obligation is to interpret the statute.
Oscar Sussman, a veterinary doctor who is chairman of the Department of Veterinary Medicine in the State Department of Health, testified for the defense that only 26 institutions[*] *87 in this State had applied for and obtained authorization to perform scientific experiments under N.J.S.A. 4:22-16, the majority of which are hospitals, with some commercial research institutions (part of whose corporate affiliates are in the food and drug field). Only two institutions of higher learning, Jersey City State College and Seton Hall Medical School (now a state school), are in the group. Rutgers, the State University, has its application pending. Dr. Sussman estimated that 300 or 400 other institutions or people, in addition to high schools and institutions of higher education, are presently conducting live animal experiments in the State, and that his department considers it none of its business. On the contrary, it favors live animal experiments in high schools, and Dr. Sussman believes the experiment here was both needed and was carried out properly. In fact, his department, in conjunction with the New Jersey Department of Education and the American Cancer Association in 1963 sponsored "Smoking and Lung Cancer," a teaching and reference guide for schools from grade level 5 through the senior college year; and among other experiments recommended for children in high schools is the placing of nicotine tars on shaved skin on the backs of laboratory mice, with this experiment to run for six months so as to form tumor or lesion formation. Included in the suggested technique is the microscopic examination of the growth of cancerous cells, if the mouse is sacrificed.[1]
The view of the Department of Health should perhaps be given some significance. It is well established that resort may be had to long usage and practical interpretation by an administrative agency in construing statutes to ascertain their meaning, to explain a doubtful phrase, or to illuminate any obscurity. The lack of interference by the Legislature over a period of years is evidence of its conformity *88 with the legislative intent and strongly inclines the courts to concurrence therein. Lane v. Holderman, 23 N.J. 304, 322 (1957); State v. Hubschman, 81 N.J. Super. 452, 459 (1963).
Regardless of whether the principle of law just enunciated applies, I would arrive at the conclusions I will shortly indicate.
Admittedly, the intervention in high school experimentation is a new field of undertaking for S.P.C.A. It asserts its rights in the field of scientific experiments; indeed it does not deny that the S.P.C.A. can intervene into the affairs of the innumerable research laboratories, whether private or corporate, that exist in the State and which are not authorized by the State Department of Health under N.J.S.A. 4:22-16(a). It does not deny that it has the right to intervene in activities of institutions of higher learning in this field, and, as I before indicated, a great many such institutions, including Rutgers, presently conduct living animal experiments in this State without authorization. Yet, as of now, S.P.C.A. seemingly takes the position that above the high school level these experiments on living animals, even though pain-inducing, are proper, since the supervision is allegedly better.
The present quarrel of S.P.C.A. is with high school experimentation of this type, but if the statute be interpreted in the tight fashion it has suggested, all of the research institutions not now authorized, as well as groups and individuals, including doctors, veterinarians and scientists experimenting with live animals in their laboratories, would need to have authorization from the State Department of Health. (The corporate entities would have to amend their charters to include the purposes designated in N.J.S.A. 4:22-16, and individuals, no matter how qualified, could not do their own work because they are not entities bearing charters "having among their corporate purposes investigation into the causes, nature, prevention and cure of diseases in men and animals." N.J.S.A. 4:22-16(a).
*89 I do not think that the Legislature ever intended such a result. On the contrary, I conclude that section 16 merely carves out a limited group, who, if their charter permits and certain steps are taken, and authorization is given, may remove themselves from investigation and prosecution by S.P.C.A. In other words, these limited groups can inflict even unnecessary pain or even needlessly mutilate or kill a living animal in the course of their work without being liable to prosecution from the S.P.C.A. "Agricultural stations" and, if "schools" be interpreted to be modified by "agricultural," then "agricultural schools," as well as the other enumerated organizations, are all of a particular kind in that they explore diseases in men and animals. It is logical, therefore, that the Legislature would give them special rights, if authorized by the State Department of Health. The Department is given supervision of this field and the right to revoke the privilege granted by section 16.
In my view, all entities other than those capable of obtaining authorization from the State Department of Health, and who have been authorized by said Department, may conduct living animal experiments, if they do not needlessly mutilate or kill or inflict unnecessary cruelty, etc.; in short, if they do not violate N.J.S.A. 4:22-26. Thus, my interpretation of the statute is that S.P.C.A. has no right to investigate and prosecute institutions authorized by the Department of Health, but may investigate all others in relation to their observance of the mandate of section 26 and to prosecute them if there be a violation. Surely, the Legislature would have used different language initially, or would have adopted different language over the years, if this interpretation be the incorrect one. It could readily have said in bold and simple language: "All experiments on living animals must be conducted under license of the Department of Health, which license the State Department may revoke for good cause." If the Legislature meant to exclude all living animal experimentation by section 16, why did it use in *90 section 26(a) and (c) the words "needlessly" and "unnecessary"?
I conclude, therefore, that because the school board has not obtained authorization from the State Department of Health  an authorization which the Department does not think it needs  the board is not thereby barred from performing living animal experimentation. And this, in my view, is true of all others who are conducting such experimentation in the State without authorization from the State Department of Health.[2]
I must next decide whether the experiment in question fell within the ban of N.J.S.A. 4:22-26 against needless mutilation or killing or the infliction of unnecessary cruelty.
To me, reading subsections (a) and (c) of section 26 in the light of all the other specific prohibitions of that section, namely (o) to (s), inclusive, I reach the conclusion that an experiment of the type here involved is not per se needless or unnecessary. All of the other subsections of 26 reveal the Legislature's awareness of the commonly accepted view that animals may properly be used by man. An animal can be driven, but not overdriven; can be loaded, but not overloaded; can be worked but not overworked. (See (o) to (s) for all the specific details of what, in the mind of the Legislature, oversteps proper bounds of human conduct.)[3]
*91 Cruelty, to my mind, is the unjustifiable infliction of pain, with the act having some malevolent or mischievous motive. There must be something willful or wanton about it. The following cases in New Jersey support this proposition: Roeber v. S.P.C.A., 47 N.J.L. 237 (Sup. Ct. 1885) (the cruel kicking or striking of a mule with the butt of a whip because it slipped and fell on the ice); N.J.S.P.C.A. v. Compton, 71 N.J.L. 86 (Sup. Ct. 1904) (cruelty to a dog); State v. Davis, 72 N.J.L. 345 (Sup. Ct. 1905), affirmed 73 N.J.L. 680 (E. & A. 1906) (using pigeons as targets to be shot at for amusement); State v. Harned, 72 N.J.L. 353 (Sup. Ct. 1905), affirmed 73 N.J.L. 681 (E. & A. 1906) (shooting pigeons as target); Rosen v. N.J.S.P.C.A., 82 N.J.L. 130 (Sup. Ct. 1911) (cruelly torturing and tormenting a horse and inflicting unnecessary cruelty by driving said horse hitched to a delivery wagon while the horse was suffering from a large gall sore upon the back); S.P.C.A. v. Whitney, 84 N.J.L. 136 (Sup. Ct. 1913) (shooting a dog in the street, wounding the animal); Bodine v. Cinkowski, 7 N.J. Misc. 1050 (Sup. Ct. 1929) (torturing and abusing dogs by keeping them in a sick and starving condition); State v. Spencer, 20 N.J. Misc. 487 (Sp. Stat. Trib. 1942) (cruelly abusing and needlessly killing an alley cat by beating it with a stick); State v. Richardson, 4 N.J. Super. 503 (App. Div. 1949) (cruelly abusing and needlessly torturing a chicken).
As referred to above, the specific prohibited acts contained in section 26 as well as the other sections in the statute indicate a common characteristic  that is, the acts are wanton and cruel and have no redeeming qualities. It is well established that in the case of an ambiguity the words take color from associated words: noscitur a sociis. Martell v. Lane, 22 N.J. 110, 117 (1956); State v. DeLouisa, 89 N.J. Super. 596, 600 (Cty. Ct. 1965). Therefore, these characteristics of wantonness and cruelty and lack of any redeeming quality were probably intended to be included within the meaning of the broader prohibited act of unnecessary cruelty *92 and needless mutilation. Accordingly, educational and scientific achievements might well represent the redeeming quality that would constitute the justification for inflicting pain or suffering on animals  to render the cruelty not unnecessary or the mutilation not needless.
I conclude that if there is a truly useful motive, a real and valid purpose, there can, under the statute, be acts done to animals which are ostensibly cruel or which ostensibly cause pain.[4]
The experiment here involved was in biology which, of course, is the study of life, and the purposes of the defendants in this and other experiments are as follows:
"1. To offer the student an opportunity to observe life processes which lead to a sympathetic respect for life.
2. To provide future citizens with some knowledge of the nature of science and of the techniques and principles of scientific inquiry.
3. To provide future citizens with some knowledge of the principles of health, disease, and medicine and of some aspects of agriculture.
4. To identify the talented student in this field.
5. To motivate selected students to become the medical and biological scientists of the future."
The experiment itself was conducted by Barry Fugere, at that time a 17-year-old sophomore in the East Orange High School. He was an outstanding student, very superior, as the high school principal testified. He was in the top seven of all East Orange students and two or three years above his age in ability. He ultimately graduated eighth out of 404. *93 Before his request to conduct the experiment was granted, his first-year biology teacher, Donald Robertshaw, gave Fugere extensive reading assignments which were followed by Fugere, and Robertshaw examined him carefully as to what he had read, checked carefully into his motives, and satisfied himself that Fugere was fully capable of conducting the experiment in all phases. Fugere was strongly motivated toward a career in medical research as a doctor and virologist, and at present is a pre-medical student at Drew University. Robertshaw, I conclude, is a fully qualified science teacher, well able to permit and supervise an experiment of this type. In addition to his work at East Orange High School, Robertshaw teaches science at Upsala College.
The experiment Fugere desired to conduct and did conduct involved the Rous sarcoma virus. Discovered many years ago, this preparation is known to produce cancerous tumors in chickens, particularly young chickens, and has been the subject of many experiments over the years. From a well respected nonprofit culture collection in Washington, Fugere asked for and obtained the virus and information on it, being sent a letter outlining the procedures in connection with the virus, and he generally followed this letter in the conduct of his experiment.
He bought four 6-8-week-old chickens, constructed two cages therefor and, because he was ill, did not inject them at 2-8 weeks, the suggested procedure, but waited until they were several weeks older. Fugere had had prior experience in injecting with a needle and therefore knew the technique. The chickens were injected with the virus on January 28, 1964. On February 10, 1964 two chickens first showed signs of developing a tumor, and on March 7, 1964 one chicken was bleeding from the tumor, which had enlarged considerably. On the advice of Robertshaw, Fugere put the chicken to death by ether. The second chicken developed a tumor which grew and spread, and this chicken died from the tumor on March 17, 1964. The other two chickens have never developed any signs of cancer.
*94 Fugere prepared slides of the matter from the tumors of the two dead chickens and studied their chest cavities and other parts of their remains. On all steps of the procedure, briefly outlined above, Robertshaw kept a close check. He had obtained permission for the whole experiment, not only from the head of his science department, but from the principal of the school, both of whom were generally aware of the progress of the experiment.
Fugere outlined in detail in his testimony the purposes that moved him to conduct the experiment and his motives in continuing it and in preparing his slides and examining them. He was particularly interested in the fact that two chickens resisted the virus and in the cause of such resistance. I am completely satisfied that his motives and those of his superiors in connection with the experiment were of the highest calibre and were purely scientific and educational in nature.
The two surviving chickens, together with details of the experiment, were, at the suggestion of another science teacher of East Orange High School, entered in the Newark Science Fair held April 6 and 7, 1964. There the matter came to the attention of Mr. Don R. Maxfield, New Jersey Executive Director of The American Humane Society, and ultimately these proceedings were instituted.
Much point was made by plaintiff of the fact that the experiment on the chickens was delayed until they were several weeks older than the suggested time of injection. The testimony satisfied me that this delay was valuable to the experiment rather than harmful.
The experiment obtained honorable mention in the Newark Science Fair and first place in a later Science Fair in East Orange. The articles Fugere read and the advance studies he made and all steps of the experiment are fully detailed in the evidence.
It is not in dispute in the case, and indeed from the evidence could not be disputed, that apart from the nature of the experiment itself, with which plaintiff quarrels, the chickens *95 were given proper care and feeding during the course of the experiment in the high school animal room, an area specially constructed for such purpose.
The issue remains as to whether the high purposes of the experiment took it out of the statutory prohibition against needless mutilation or killing or unnecessary cruelty. To this issue the greater part of the testimony in the case was directed.
On this vital point defendants produced many distinguished witnesses, including scientists, educators, writers or collaborators or directors of a new series, "Biological Sciences Curriculum Studies." This project, as developed in the testimony of its director, Dr. Arnold B. Grobman, was a result of Federal Government grants of some eight million dollars and involved long effort on the part of leaders in the field. In the books and pamphlets of this project for science teaching in the high schools of this country there are featured the advantages of living animal experiments to be conducted by students under appropriate supervision. Suffice it to say that this project has resulted in the production of books and pamphlets which are probably among the most widely used in the country in the teaching of high school science. The blue book in the series was copyrighted in 1963, and I gather the other books and pamphlets appeared around that time.
The testimony of Dr. Grobman, presently Dean of the College of Arts and Sciences at Rutgers, is illustrative of the views of virtually all of the other expert witnesses produced on the subject by defendants. He said that the use of living animals is essential at the high school level for biological studies in that it (1) helps students have sympathy for living things; (2) helps make them literate in the scientific field; (3) motivates other students to scientific careers; and (4) eliminates study by rote. Other witnesses detailed other good purposes.
According to Dr. Grobman and the other expert defense witnesses, the goal of present high school science teachers should be to encourage laboratory work with plants and with *96 animals, both dead and alive. Many of the experiments, according to these witnesses, use live chickens and other live animals. They agree that what Fugere did was necessary for his educational development.
As against this array of testimony, plaintiff produced an educator in the field, Robert M. Frey, Professor of Biology at Plymouth State College, University of New Hampshire, a doctor of education. Dr. Frey viewed Fugere's experiment as unnecessary and he emphatically stated he does not recommend animal experimentation at the high school level. He felt some students would be scared away from science by this type of work, and believed it should be postponed until the students are more mature. He felt such experiments have no educational value. He believed lecture demonstrations with models, films and slides would be the best possible method for high school students. He said that animal experimentation at his college is commenced in the junior year.
As to the use of models, films and slides, defendants' experts concede they have a place, but were of the opinion that these were far inferior to living animal experimentation under proper circumstances and under suitable supervision by qualified high school science teachers.
Testifying for plaintiff, James T. Mehorter, Professor of Psychology at Montclair State College, asserted that an experiment such as was here conducted, or any experiment upon living animals at the high school level, would have an adverse effect on the mental health of adolescents. He presented an impressive argument for this point of view. Nonetheless, he did not discuss any specific example of such an adverse result having occurred.
In opposition to Professor Mehorter's views, defendants presented Bertram D. Cohen, Professor of Psychology at the College, Graduate School and Medical School of Rutgers University. Dr. Cohen has a distinguished background, with many publications and much work in the field to his credit. In his view, no harm would come to a student who engages in such experimentation; on the contrary, he felt that *97 the student would be benefited. From his extensive work in clinics dealing with juveniles, Dr. Cohen said that a science experiment would not cause mental disturbances of the type envisioned by Professor Mehorter. I accept wholeheartedly Dr. Cohen's views.
S.P.C.A. contends that even if a properly conducted scientific experiment performed on live animals would not per se constitute a violation of the statute, the particular experiment involved here was improperly conducted. I am satisfied from the evidence that this experiment was in fact properly conducted, but even if there were mistakes, I am convinced by the evidence that they did not diminish the educational value of the experiment and may have actually added to the learning process.
I am further convinced from all the testimony that the type of experiment in this case, conducted as it was under the careful supervision of qualified people, did not constitute either an abuse or a needless mutilation or killing or unnecessary cruelty upon and of living animals or creatures. Thus, N.J.S.A. 4:22-26 was not violated.
Having reached this result, it becomes unnecessary to decide some of the other objections defendants interpose to an interpretation of the statute in accordance with the view of S.P.C.A. I therefore do not have to reach any determination as to whether such interpretation would result in discrimination against the board. Nor do I have to decide whether the authority which S.P.C.A. asserts is conferred upon the New Jersey Department of Health is an unconstitutional delegation of legislative power.
In the person of its first two witnesses, S.P.C.A. produced testimony indicating that the two well chickens exhibited at the Newark Science Fair were to some degree inadequately caged and were without water and food for 3 1/2 hours. Maybe the cage used at the Newark Science Fair, which was smaller than the one used during the experiment, could have been a little larger, because in it the chickens had to stoop a bit. Yet, for the short period of their confinement *98 I find the cage to have been entirely satisfactory. As to the lack of food and water for 3 1/2 hours, Barry Fugere outlined in detail what he himself had done and what preparation he had made. He fed and watered the chickens on two occasions on their first day there, and again at 6 P.M. on the second and last day. He had anticipated being at the Fair at 4 or 4:30 P.M. on the second day, but was delayed in transit by an automobile accident. Moreover, he had made arrangements with an attendant there to supply them with food and water if he should be absent, but the attendant apparently failed to act for a short period.
Under these circumstances I hold that the board of education did not violate N.J.S.A. 4:22-26 in connection with the exhibit at the Newark Science Fair, even if the chickens suffered unduly. However, I find they did not suffer unduly and that whatever discomfort they had was of a transitory, temporary nature and was not cruelty or anything else prohibited by the statute.
S.P.C.A. further argue that the particular virus could be of some danger to human beings. From the evidence on this score, I find this particular strain of Rous sarcoma virus apparently presented no danger to humans, although certain present strains of the virus might, according to the "Potential Biohazards in Cancer Research," conceivably present such danger. Future experiments with cancer virus might well be conducted with this thought in mind, so that adequate precautions can, if deemed necessary, be taken for the human beings involved.
In the course of the trial I stated that the injection of the chickens did not, in my opinion, cause pain of any significance in so far as the statute is concerned. If any pain there was at the time of the injections, it was de minimis. I adhere to such ruling.
It is argued by S.P.C.A. that the court is a poor place to determine the justification of inflicting pain on animals. While there seems to be some merit to this point, the courts make similar determinations with respect to victims who happen *99 to be people. S.P.C.A. does not argue that the courts do not have the exclusive original jurisdiction over acts of cruelty occurring outside of scientific experiments.
S.P.C.A. further argues that the court would act after the harm had been inflicted. This is just as regrettable as the situation where the court in a murder trial acts after the harm has been done. There is hope that penal laws have some deterrent effect, and this effect presumably occurs before each violation.
S.P.C.A. also argues that the result, if defendant board is successful, would be that the science teacher would determine when the experiment was justified, balancing his evaluation of the pain and cruelty against the educational value to be derived. This, indeed, would place a heavy responsibility in the hands of the teacher, but then again, the minds of our children are also placed in his hands.
For the reasons expressed there will be judgment entered for defendants.
NOTES
[*] Vineland State School, Jersey City State College, Monmouth Medical Center, St. Elizabeth's Hospital, Wallace Research Institute, Cyanamid Foundation for Agricultural Development, United Hospital of Newark, Hackensack Hospital, Campbell Soup Co. Research Institution, Middlesex General Hospital, Passaic General Hospital, Warner-Lambert Research Institute, Ethicon Research Foundation, St. Francis Hospital, West Jersey Hospital, Orange Memorial Hospital, Newark Beth Israel Hospital, Newark Medical Center, St. Barnabas Hospital, State Seton Hall Medical School, St. Francis Hospital, Merck Institute, Rutgers University (pending authorization), Ortho Research, Deborah Hospital and St. Vincents' Hospital.
[1] It is to be noted how close this experiment comes to the one here involved, the essential difference being the use of mice in one and of chickens in the other.
[2] While the entities enumerated in N.J.S.A. 4:22-16 include "agricultural stations" and "schools maintained by the state or federal government," it becomes unnecessary to determine definitively whether a high school was intended to be there included. An entity capable of receiving authorization but which has not received such authorization would in my view be in the identical situation as an organization not capable of receiving authorization under section 16(a). It is undisputed that the board received no authorization from the State Department of Health.
[3] This accepted principle of mankind has been expressed in the Bible, Book of Genesis, chapter 1, verse 26, (Authorized King James Version):

"And God said, `Let us make man in our image, after our likeness: and let them have dominion over the fish of the sea, and over the fowl of the air, and over the cattle, and over all the earth, and over every creeping thing that creepeth upon the earth.'"
[4] Most of the witnesses in the case professed themselves as unable to say the two chickens which developed cancer were in pain as a result of their tumor. Evidently no one has yet been able either to determine scientifically the existence of or the measurement of pain in chickens or animals of this type. Yet, for the purpose of this case, I am satisfied the chickens certainly suffered some discomfort and probably some pain. At any rate, our Legislature, by the very enactment of this statute, would have seemed to have considered the subject and placed prohibitions on needless or unnecessary discomfort or pain, or whatever the feeling of the chickens may be termed. In any event, there was in this case some mutilation and killing, mentioned in section 26.