CHRISTOPHER LANE, *ET AL.*, PETITIONERS-APPELLANTS, v. CARL HOLDERMAN, COMMISSIONER OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, RESPONDENT-RESPONDENT.

Argued December 20, 1956—Decided February 4, 1957.

306

308

Mr. *John H. Yauch, Jr.,* argued the cause for appellants (*Mr. James E. Fagan,* of counsel; *Mr. Daniel A. Degnan,* on the brief; *Messrs. Gilhooly, Yauch & Fagan,* attorneys).

Mr. *Thomas L. Franklin,* Deputy Attorney-General, argued the cause for respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of N. J., attorney; *Mr. David D. Furman,* Deputy Attorney-General, of counsel).

Mr. *Sol .D. Kapelsohn* and *Mr. William J. Isaacson,* attorneys for Amalgamated Clothing Workers of America, AFL-CIO, *amicus curiae* (*Messrs. William J. Isaacson, Sol D. Kapelsohn* and *Herbert Semmel,* on the brief).

Mr. *Roger Hinds, amicus curiae,* representing National Consumers' League and Consumers' League of N. J.; New Jersey Council of Churches, and its department, United

Church Women of N. J.; Protestant Episcopal Diocese of N. J., Dept. of Christian Social Relations; Protestant Episcopal Diocese of Newark, Dept. of Christian Social Relations; N. J. State Federation of Colored Women's Clubs, Inc.; N. J. State Federation of Labor.

The opinion of the court was delivered by

WACHENFELD, J. Appellants, 43 employers in the laundry, dry cleaning and dyeing industry, petitioned the Appellate Division under R. R. 4:88–10 for a judgment declaring the provisions regulating overtime rates in Minimum Fair Wage Standards Mandatory Order No. 10, promulgated by the Commissioner of Labor and Industry under the Minimum Wage Act, invalid.

The order in question was issued on November 7, 1955 and governs the employment of women and minors in the affected industry. Pursuant to the recommendations of the wage board appointed by the Commissioner to survey conditions prevailing in this field of service, the order fixed a basic minimum wage, after the first four weeks of employment, of 85 cents per hour for non-clerical workers and 80 cents per hour for clerical workers, effective May 6, 1956. In addition, it embodied administrative regulations formulated by the Commissioner which specified that, after a gradual start, commencing on November 8, 1956 women and minor employees must be paid one and one-half times the "regular hourly wage rate" for work in excess of 40 hours per week. The provisions with respect to overtime compensation and the methods of adoption and computation are as follows:

"Overtime Rates. Overtime rates mean one and one-half times the employee's regular hourly wage rate which shall be paid to each woman and minor subject to the provisions of this Order for hours worked in excess of forty-eight (48) hours in any work week during the period of time beginning with May 6, 1956 through August 6, 1956; hours worked in excess of forty-four (44) hours in any work week during the period of time beginning with August 7, 1956 through November 7, 1956, and hours worked in excess of forty (40) hours in any work week beginning on or after November 8, 1956. The overtime rates established by this Order shall not

apply in the case of any person employed on a weekly, monthly or yearly salary basis, whose salary reduced to a weekly basis is in excess of $60.00 and whose employment is in a *bona-fide* supervisory or executive capacity.

Regular Hourly Wage Rate. The term 'regular hourly wage rate,' as used in this Order, shall mean the amount that the employee is regularly paid for each hour of work. When an employee is paid on a piece work basis or any other basis than an hourly rate the 'regular hourly wage rate' shall be determined by dividing the total of the hours worked during the week into the employee's total earnings exclusive of part time bonuses for the week and exclusive of wages earned at overtime rates as such rates are defined in this Order."

By stipulation, the issues presented for the consideration of the Appellate Division were limited to two in number. The first involves solely a question of statutory interpretation and concerns the authority of the Commissioner under the provisions of the Minimum Wage Act to define overtime rates and the number of hours worked per week after which said rates shall become effective. Implicit in this challenge to the powers of the Commissioner is the subsidiary consideration of whether, in any event, he had the right to base the prescribed overtime rates upon the hourly wage actually paid by the petitioners which might deviate from the basic minimum wage recommended by the wage board. The second issue, however, brings into controversy the constitutionality of *R. S.* 34:11–47, as amended *L.* 1941, *c.* 321, § 2, *p.* 862. The petitioners maintain that if the Commissioner does have the authority to establish overtime rates, its exercise is not sufficiently guided by standards to satisfy constitutional requirements concerning delegation of powers.

The Appellate Division determined all of these contentions adversely to petitioners except that attacking the use of the "regular hourly wage" rather than the minimum of 80 or 85 cents an hour as the figure for computing overtime. With respect to the latter, the court below declined to express an opinion, being of the view that none of the petitioners enjoyed standing since they had not demonstrated injury by proving their regular hourly rates exceeded the minimum wage prescribed.

Upon application by 43 of the 64 employers originally supporting the cause, we granted certification.

Initially, it is important to observe by way of clarification that appellants do not assail the Commissioner's regulations, as embodied in the order in controversy, for lack of substantial evidence justifying their adoption. Neither do they impugn the subject order for any failure by the Commissioner or by the wage board to comply with the fairly elaborate procedural requirements of the Minimum Wage Act. Despite this, to discuss intelligently the arguments advanced by appellants, it seems necessary to give at least a cursory account of the conditions prerequisite to the issuance of a final mandatory order and the *modus operandi* by which its terms are established.

The Minimum Wage Act was originally adopted by the Legislature in 1933. *L.* 1933, *c.* 152. It has since been twice amended. *L.* 1941, *c.* 321 and *L.* 1953, *c.* 33. The act declares the employment of women and minors in this State at an unreasonable and oppressive wage to be contrary to public policy. An unreasonable and oppressive wage is defined as one that is both less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health. When the Commissioner finds a substantial number of women and minors in any occupation are receiving such wages, he is obligated to appoint a wage board. This body consists, at a maximum, of three representatives of the employers in the occupation involved, three representatives of the employees, and three disinterested members representing the public.

Upon the convening of the wage board, the Commissioner presents to it all the evidence and information in his possession relating to wages of women and minor workers in the occupation under scrutiny, any other information which he deems relevant to the establishment of a minimum fair wage, and witnesses he thinks material. The board has the power to require by subpoena the attendance and testimony of

those it desires to hear, and the production of all books, records and other evidence relative to the matters under investigation.

Within 60 days after its organization, the wage board submits a report to the Commissioner embodying its recommendations of minimum fair wage standards for women and minors in the subject occupation. The Commissioner is directed to accept or reject the report within ten days thereafter. If the report is rejected, the Commissioner is enjoined to resubmit the matter to the same board or to a new board, describing his reasons for rejection. If the report is accepted, it must be published together with such administrative regulations the Commissioner proposes as appropriate to supplement the report and to safeguard the minimum fair wage standards to be established. At the time of publication, notice is required of a public hearing before the Commissioner. All persons favoring or opposing the recommendations contained in the report or the proposed regulations are given the opportunity of being heard.

Within ten days after the hearing, the Commissioner must finally approve or disapprove the report. Disapproval ordinarily entails resubmission of the matter to the same wage board or to a new board. When the Commissioner approves the report, however, he must promulgate a mandatory order containing the minimum fair wage rates included in the report and the proposed administrative regulations. The order becomes effective 180 days after it is issued.

The Commissioner and the wage board in establishing a minimum fair wage under the act consider: (1) all relevant circumstances affecting the value of the service or class of service rendered; (2) wages paid in the State for work of like or comparable character by employers who voluntarily maintain minimum fair wage standards; and (3) the factors which a court would consider in a *quantum meruit* suit. A "fair wage" is defined to be: "a wage fairly and reasonably commensurate with the value of the service or class of service rendered." *R. S.* 34:11–34.

## I. COMMISSIONER'S POWERS TO REGULATE OVERTIME RATES AND TO DETERMINE WHEN THEY SHALL GO INTO EFFECT

Appellants contend that "the overall language and intent of the minimum wage act demonstrates that 'overtime' has a restricted meaning and does not purport to confer authority to fix overtime in the sense of a premium or penalty rate for excessive working hours." The gist of their argument is that the purposes of the Minimum Wage Act are subserved solely through the establishment of the minimum fair wage, in this instance 80 or 85 cents an hour. They contend a complete reading of the act reveals its object to be the establishment of wage rates adequate for subsistence to which the concept of an overtime premium is alien.

 The meaning of a statute is primarily ascertained by reading the language employed in its ordinary and common significance. See *Jamouneau v. Harner,* 16 *N. J.* 500, 513, petition for *certiorari* denied 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1954); *Julius Roehrs Co. v. Division of Tax Appeals,* 16 *N. J.* 493, 497, 498 (1954); *Abbotts Dairies, Inc., v. Armstrong,* 14 *N. J.* 319, 325 (1953); *Bass v. Allen Home Improvement Co.,* 8 *N. J.* 219, 226 (1951); *Eckert v. New Jersey State Highway Dept.,* 1 *N. J.* 474, 479 (1949). The language of *R. S.* 34:11–47 amply establishes the intent of the Legislature to invest the Commissioner of Labor with authority to regulate the payment of overtime compensation, even though the rate adopted will exceed the minimum fair wage recommended by the wage board. This section reads as follows:

"Within ten days after the hearing the commissioner shall confer with the director and approve or disapprove the report of the wage board. If the report is disapproved the commissioner may resubmit the matter to the same wage board or to a new wage board. *If the report is approved the commissioner shall make a mandatory order* which shall define minimum fair wage rates in the occupation or occupations as recommended in the report of the wage board and *which shall include such proposed administrative regulations as the commissioner may deem appropriate to supplement the report of the wage board and to safeguard the minimum fair wage, standards estab-*

lished. *Such administrative regulations may include among other things, regulations defining and governing* learners and apprentices, their rates, number, proportion or length of service, piece rates or their relations to time rates, *overtime or part time rates,* bonuses or special pay for special or extra work, deductions for board, lodging, apparel or other items or services supplied by the employer, and other special conditions or circumstances ; *and in view of the diversities and complexities of different occupations and the dangers of evasion and nullification, the commissioner may provide in such regulations* without departing from the basic minimum rates recommended by the wage board *such* modifications or reductions of or *addition to such rates in or for such special cases or classes of cases as those herein enumerated as the commissioner may find appropriate to safeguard the basic minimum rates established.* Said mandatory order shall take effect upon expiration of one hundred eighty days from the date of the issuance of the order." (Emphasis supplied)

█ It is prominently ascertainable that the Commissioner is empowered to increase the basic fair wage rate in the special case of overtime. The meaning of the words used is so clear as to leave no doubt respecting their import. The petitioners' attempt to persuade to the contrary, while ingenious, is specious in its legal reasoning. There is no justification in the context of the act itself for limiting the Commissioner's powers over "overtime" to the situation where a fixed wage is ordered for a week comprising a certain number of working hours.

It is suggested that the only type of "overtime" which *R. S.* 34:11–47 contemplates is that exemplified by the Arizona Commissioner's order reported in 4 *C. C. H., Labor Law Reporter, par.* 44055.01, Order No. 2A, for the laundry and dry cleaning industry. There a pay scale of $18.72 was established for a week not exceeding 36 hours. This amounted to 52 cents an hour. For hours worked past 36 during any one week, an hourly rate of 52 cents an hour is specified. Thus, the Arizona employer is prevented from evading or nullifying the effects of the minimum wage order by working his employees overtime at no extra pay or a reduced rate.

█ But this argument ignores the fact that our act explicitly states the Commissioner may work "such modifications or reductions of or *addition to,*" the minimum fair wage as he may find appropriate to safeguard the basic rates

established. (Emphasis supplied) "Addition" is defined in Webster's New International Dictionary as the "act, process, or instance of adding; also, anything added; increase; augmentation; accession; * * *." Therefore, the Commissioner has the authority to increase the basic minimum rates through provisions for overtime. The rationale justifying his endowment with this power, as it relates to the purposes of the Minimum Wage Act, will be discussed hereafter.

 It is said the section under discussion does not in specific terms imbue the Commissioner with authority to designate the number of hours after which the overtime rates shall take effect. While it is true powers or jurisdiction may not be simply implied on behalf of an administrative official, the grant of an express power is always attended by the incidental authority fairly and reasonably necessary or appropriate to make it effective. *Jersey City v. State Water Policy Comm.*, 118 *N. J. L.* 72 (*E. & A.* 1937); 3 *Sutherland, Statutory Construction* (1943 *ed.*), § 6604; 73 *C. J. S., Public Administrative Bodies and Procedure*, § 50. See *Tanis v. Passaic County*, 126 *N. J. L.* 303, 305 (*E. & A.* 1940); *Belfer v. Borrella*, 9 *N. J. Super.* 287, 293 (*App. Div.* 1950). It is patent that the legislative grant to the Commissioner to control overtime rates is successfully emasculated unless he can determine at what point in the work week they should apply. There is little justification for enlisting in the cause of futility when a rational result is otherwise available.

 We think the intention of the Legislature to give the Commissioner power to establish overtime rates effective after a prescribed number of hours is evident, and we are reassured by the fact that every relevant principle of statutory construction discussed under Point III confirms our conclusion.

## II. CONSTITUTIONALITY OF THE DELEGATION

We now proceed to inquire into the constitutionality of the delegation of power, since our reflections upon this subject

will illuminate the consideration as to whether or not the Commissioner acted within his assigned powers in ordering overtime rates to be based upon the "regular hourly wage," as opposed to the basic minimum fair wage.

Appellants insist that assuming the Commissioner has the authority to promulgate overtime rates and to designate the maximum number of hours after which they are to take effect, his discretion is not adequately guided by standards sufficient to avoid the imputation of an unconstitutional delegation.

The Commissioner is commanded to supplement the report of the wage board and to safeguard the minimum fair wage standards established. The words "supplement" and "safeguard," as used in the statute, are not sufficiently definitive, say the appellants. But obviously these words refer to safeguarding the *purposes* of the Minimum Wage Act which in turn properly delimit the Commissioner's powers. The context of the act and its imbedded objectives may be considered in determining whether or not the administrator's discretion is constitutionally circumscribed. *Schierstead v. City of Brigantine,* 20 *N. J.* 164 (1955) ; *Ward v. Scott,* 11 *N. J.* 117 (1952) ; *American Power & Light Co. v. Securities & Exchange Comm.,* 329 *U. S.* 90, 67 *S. Ct.* 133, 91 *L. Ed.* 103 (1946).

The Minimum Wage Act has a twofold purpose. It is to aid oppressed employees in the achievement of a wage "sufficient to meet the minimum cost of living necessary for health" and to insure the employee receives a wage "fairly and reasonably commensurate with the value of the service or class of service rendered." See *R. S.* 34:11-34.

Appellants urge that provisions for premium pay on an overtime basis have no relation to carrying out the legislative intent. The basis for this hypothesis is the fallacious assumption that the proclamation of a minimum rate alone fulfills the purposes of the act. Despite assurance of a minimal hourly return, however, it is quite clear a living wage cannot be achieved unless the employee is engaged for more than a few hours per week. The requirement of an hourly rate only becomes meaningful as related to "the

minimum cost of living necessary for health" when it is applied to the employee's opportunity to labor an average number of hours each week. *Mary Lincoln Candies, Inc., v. Department of Labor,* 289 *N. Y.* 262, 45 *N. E.* 2d 434, 143 *A. L. R.* 1078 (*Ct. App.* 1942). A minimum rate of 85 cents per hour for a non-clerical employee will not prove adequate to maintain health and well-being if he has only the limited opportunity of working four or five hours a week.

By acting as a financial deterrent to the employment of certain workers for long hours to the detriment of their fellows' opportunity to labor, regulations placing a premium upon "overtime" assist in promoting the obtainment of a weekly recompense sufficient to maintain health. They encourage a more even distribution of available work among existing employees.

Furthermore, appellants concede illness and accident occur in greater measure during overtime hours. Disabilities prohibit the steady employment which produces a minimum living wage on a long-term basis. Therefore, to the extent that overtime rates discourage the employer from prevailing upon his employees to spend excessive hours in the factory, they operate to secure the "minimum cost of living necessary for health."

Appellants deny that another and independent purpose of the Minimum Wage Act is to secure for employees a wage fairly and reasonably commensurate with the value of the service or class of service rendered. *R. S.* 34:11–36 declares employment at an "oppressive and unreasonable wage" to be contrary to public policy. *R. S.* 34:11–34 defines an oppressive and unreasonable wage as "a wage which is *both* less than the fair and reasonable value of the services rendered and less than sufficient to meet the minimum cost of living necessary for health." (Emphasis supplied) In *précis,* the argument runs that the act is directed exclusively toward eliminating oppressive and unreasonable wages where they prevail and that whether a wage rate falls into this objectionable category ultimately depends upon its sufficiency to maintain health. Thus, say appellants, the fair and reasonable

value of services, considered in isolation, cannot serve as a standard.

· It is important to realize, however, that the existence of a substantial number of women or minors receiving oppressive and unreasonable wages from any occupation is only the stimulus which impels the Commissioner to set in motion the administrative processes leading to rectification. The remedy for the imposition upon these vulnerable classes of employees is not merely establishment of a minimum wage tending to produce the minimum cost of living but the promulgation of a "minimum fair wage" which is defined in *R. S.* 34:11–34 as *"a wage fairly and reasonably commensurate with the value of the service or class of service rendered."* (Emphasis supplied)

If doubt exists as to the proper construction of a statute, resort may be had to the preamble for clarification. *Grobart v. Grobart,* 5 *N. J.* 161 (1950); *Blackman v. Iles,* 4 *N. J.* 82 (1950); *Magierowski v. Buckley,* 39 *N. J. Super.* 534 (*App. Div.* 1956). The original preamble to the act in question states:

> "The employment of women and minors in trade and industry in the State of New Jersey at wages unreasonably low and not fairly commensurate with the value of the services rendered is a matter of grave and vital public concern. * * *
> Judged by any reasonable standard, wages are in many cases fixed by chance and caprice and the wages accepted are often found to bear no relation to the fair value of the service rendered."

The Legislature was obviously concerned with trying to insure payment commensurate with the value of the work performed.

Does the fixing of maximum hours beyond which premium overtime rates shall be paid aid in securing the subject employees a fair return for their services? It is common knowledge that in almost every occupation overtime wages are today paid. Among the 64 petitioners to the Appellate Division, 63 voluntarily paid one and one-half times the regular hourly wage rate. Concededly, requiring payment of special rates for overtime labor serves objects

other than insuring a fair return to the employee, but overtime may also logically be deemed a "class of service rendered" which is to be rewarded by a wage fairly and reasonably commensurate with its distinctive value. It was in part this point of view which led Congress to enact the Fair Labor Standards Act, 29 *U. S. C. A.* § 201 *et seq.,* embodying a provision for overtime compensation at one and one-half times the regular rate of pay. *Bay Ridge Operating Co. v. Aaron,* 334 *U. S.* 446, 68 *S. Ct.* 1186, 92 *L. Ed.* 1502 (1948) ; *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 *U. S.* 419, 65 *S. Ct.* 1242, 89 *L. Ed.* 1705 (1945) ; *Walling v. Helmerich & Payne, Inc.,* 323 *U. S.* 37, 65 *S. Ct.* 11, 89 *L. Ed.* 29 (1944) ; *Overnight Motor Transportation Co. v. Missel,* 316 *U. S.* 572, 62 *S. Ct.* 1216, 86 *L. Ed.* 1682 (1942).

 Thus, we find the Commissioner's discretion to establish overtime rates to take effect after a maximum number of hours is limited by whether its exercise reasonably tends to procure, on behalf of the employees covered by his regulations, a subsistence wage fairly commensurate with the special service rendered. We are satisfied that the authority to proclaim premium rates is one of many elements in the enactment designed to foster its purposes. Whether such authority has been abused can be tested by reference to those purposes.

Are these standards adequate? Since the question has never before been raised under the Minimum Wage Act, we may prudently turn to the examination of statutes in other fields which have been supported against a similar challenge. Without meticulous exposition of the cases on this subject, it seems safe to say, taking into account the nature of the subject matter regulated in each instance, that standards of a more general nature than those involved here have consistently been sustained as adequate to avoid the imputation of unconstitutionality.

Thus, the Municipal Finance Commission is controlled by the simple standard of providing for the "payment of existing obligations in such a way as to cause the least embarrassment to property owners as taxpayers" in determining whether to

permit an insolvent municipality to sell lands not needed for public use. *R. S.* 52:27–65. *Schierstead v. City of Brigantine, supra.* In awarding franchises for bus service, the Board of Public Utility Commissioners is guided by the general consideration of whether such "franchise is necessary and proper for the public convenience and properly conserves the public interests." *R. S.* 48:2–14. *In re Greenville Bus Co.*, 17 *N. J.* 131 (1954). See also *R. S.* 48:11–1 ("public convenience and necessity") and *R. S.* 48:2–21 ("just and reasonable").

The discretion of the Commissioner of Alcoholic Beverage Control, with respect to fixing prices and issuing regulations, is limited by the general direction to administer the statute in "such a manner as to promote temperance and eliminate the racketeer and bootlegger." *R. S.* 33:1–3, 39. *Gaine v. Burnett,* 122 *N. J. L.* 39 (*Sup. Ct.* 1939), affirmed 123 *N. J. L.* 317 (*E. & A.* 1939). And *R. S.* 4:12A–21 empowers the Director of the Milk Control Board to take such measures as may be "necessary to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interests in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State." See *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 521 (*E. & A.* 1935); *Como Farms, Inc. v. Foran*, 6 *N. J. Super.* 306, 312 (*App. Div.* 1950).

Standards sustained as adequate by the Supreme Court of the United States have been equally if not more broad, as is indicated by the analysis in *Lichter v. U. S.*, 334 *U. S.* 742, 786, 68 *S. Ct.* 1294, 92 *L. Ed.* 1694 (1948).

### III. Commissioner's Power to Base Overtime Rates on "Regular Hourly Wage" Rather Than Basic Minimum Wage

The court below felt this question was prematurely posed since none of the petitioners had demonstrated they actually

paid more than the minimum rate provided in Mandatory Order No. 10. We think, however, the query was within the orbit of the issues raised and should have been decided on the merits.

Although a *petition* for declaratory judgment under *R. R.* 4:88–10 is brought to review *quasi*-legislative action in lieu of the former practice of a writ of *certiorari,* see *Carls v. Civil Service Comm. of N. J.,* 17 *N. J.* 215, 219, 220 (1955), the principles pertaining to the rendering of judgment in an *action* for a declaratory judgment are nonetheless instructive. See *Wagner v. Ligham,* 37 *N. J. Super.* 430 (*App. Div.* 1955). In contrast to the narrow view predominant at the inception of this mode of action, declaratory judgments now, in general, receive favorable treatment on the part of our courts when asked to exercise jurisdiction. See *National-Ben Franklin Fire Ins. Co. v. Camden Trust Co.,* 21 *N. J.* 16 (1956); *Abbott v. Beth Israel Cemetery Assn.,* 13 *N. J.* 528 (1953); *Blackman v. Iles, supra; New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235 (1949).

Here, resolving the rights and duties of the parties before further damage ensues by reason of the Commissioner's order may prevent extensive subsequent litigation. The appellants are the direct objects of the Commissioner's order and have a vital interest in ascertaining its validity. In our economy wages frequently fluctuate in response to labor market conditions, and the petitioners' freedom to bargain may be impinged upon by their uncertainty as to whether or not a regular wage in excess of the minimum ordered by the Commissioner is the gauge of overtime rates. Until this is determined, they can make no accurate forecast as to their labor costs.

Then too, if the matter is not decided now, the petitioners could reinstitute this action with respect to the point under discussion merely by raising the wages of the employees involved a few cents above the minimum. The necessity for such a circuitous process of attaining justice was one of the objectionable features we hoped our new court system had successfully abolished. We think the controversy is season-

ably ripe for judicial determination. See *Wagner v. Ligham,* 39 *N. J. Super.* 13 (*App. Div.* 1956), for a very liberal application of *R. R.* 4:88–10.

■ On the merits, we conclude the Commissioner's action should be sustained as within the scope of his authority delineated by statute. Overtime rates based on the wage actually paid reasonably subserve the purposes of the enactment in helping to secure a fair and reasonable compensation for services rendered and a minimum living wage.

They obviously serve to distribute work and to prevent impairment of health in a manner impossible to accomplish using the minimum wage.

The question as to the authority of the Commissioner to fix overtime rates at time and one-half regular pay was called "troublesome" by the tribunal below, apparently because a literal reading of the language employed in *R. S.* 34:11–47 might possibly be interpreted as restricting the allowable increase for overtime work to a percentage of the established minimum rate.

Any such approach, however, is obliterated by the history of the enactment, its purposes, the administrative action with reference to it over the many years, and the common practices of both labor and management.

As stated previously, it is usual to pay at one and one-half times the regular wage. The practice is so universal that when an employee is retained and told he will receive time-and-a-half as overtime, he automatically assumes it will be computed upon his regular hourly wage. No inquiry is customarily made as to the possible utility of any other standard.

■ For 17 years the Commissioner has construed the act as delegating to him the power to base overtime rates on the regular rate where such is deemed appropriate in the occupation being considered. Commissioner, Mandatory Orders Nos. 2, 3 and 9. The principle is well established by a wealth of authority that resort may be had to long usage and practical interpretation in construing statutes to ascertain their meaning, to explain a doubtful phrase or to illuminate any obscurity. See, *e. g., State Department of Civil Service*

*v. Clark,* 15 *N. J.* 334, 341 (1954) ; *Swede v. City of Clifton,* 39 *N. J. Super.* 366 *(App. Div.* 1956), affirmed 22 *N. J.* 303 (1956) ; *Kaske v. State,* 34 *N. J. Super.* 222, 225–226 *(App. Div.* 1955) ; *Walsh v. Department of Civil Service,* 32 *N. J. Super.* 39, 48–49 *(App. Div.* 1954).

Furthermore, this administrative construction has, inferentially at least, received legislative approval when, after the promulgation of Mandatory Orders Nos. 2 and 3, the Legislature amended the very section under discussion, *R. S.* 34:11–47, in 1941 *(L.* 1941, *c.* 321, § 2, *p.* 862), but imposed no new limitations upon the Commissioner's powers. See *Harper v. New Jersey Manufacturers Casualty Ins. Co.,* 1 *N. J.* 93, 99 (1948).

█ Additionally, a statute should be interpreted by a mind sympathetic to its aims which recognizes the difficulties inherent in formulating a precise expression of legislative intent in light of the diversity of circumstances to be covered. As was said in *Waters v. Quimby,* 27 *N. J. L.* 296, 311 *(Sup. Ct.* 1859), affirmed 28 *N. J. L.* 533 *(E. & A.* 1859), and repeated in *Lloyd v. Vermeulen,* 22 *N. J.* 200, 205 (1956) :

"When the words of a statute are susceptible of two meanings, the one favorable, and the other hostile to its principal design, the former should prevail and control the construction. Where the words are clear, and the difficulty is made by critical exposition, that exposition should not be adopted in clear contravention of the scope and policy of the act. Few statutes would stand if tried by the strictest standards of logic, grammar, or rhetoric."

See also *DeFazio v. Haven Savings & Loan Ass'n,* 22 *N. J.* 511, 518 (1956), and *Caputo v. Best Foods, Inc.,* 17 *N. J.* 259, 263–264 (1954).

█ We conclude the Commissioner's determination to establish overtime rates based upon the "regular hourly wage," as stated in Mandatory Order No. 10, must be sustained as a valid exercise of a properly delegated authority.

As modified and expanded, the judgment below is affirmed.

Justice HEHER votes to affirm the judgment of the Appellate Division according to the opinion of Judge CLAPP.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and WEINTRAUB—7.

*For reversal*—None.