917 A.2d 722

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. RANDI
FLEISCHMAN, DEFENDANT–RESPONDENT.

Argued November 29, 2006—Decided March
19, 2007—Corrected March 26, 2007.

540

*Greta A. Gooden Brown,* Assistant Attorney General, argued the cause for appellant (*Stuart Rabner,* Attorney General of New Jersey, attorney; *Ms. Brown* and *John F. Kennedy,* Assistant Attorney General, of counsel and on the briefs).

*Gerald D. Miller,* argued the cause for respondent (*Miller, Meyerson, Schwartz & Corbo,* attorneys; *Mr. Miller* and *Leonard Meyerson,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

Pursuant to the New Jersey Code of Criminal Justice (Code), one can be charged with the offense of insurance fraud for knowingly making a false or misleading statement of material fact in connection with an insurance claim. *N.J.S.A.* 2C:21–4.6. That third-degree offense may be elevated to the second degree by

aggregating five "acts" of insurance fraud, the total value of which exceeds $1,000.

The State indicted defendant Randi Fleischman for second-degree insurance fraud. The factual underpinnings for the charge were based on various items of false information contained in defendant's statements to the police and to her automobile insurer in connection with a stolen car claim. Defendant challenged the sufficiency of the evidence to support the indictment, claiming that her three statements (made when reporting to the police that her car had been stolen and when submitting an oral and then written insurance claim) constituted only three "acts" of insurance fraud. This appeal provides the Court with its first opportunity to construe *N.J.S.A.* 2C:21–4.6's penalizing of a false "statement" as an "act of insurance fraud" that can be accumulated to elevate insurance fraud to a second-degree offense.

## I.

The State presented the following facts to the grand jury. On December 4, 2003, after having made arrangements for a friend to dispose of her 2000 Chrysler Sebring, defendant contacted the Edison Police to report that her car had been stolen.[1] She told the police that she arrived alone at the Menlo Park Mall at 5:30 p.m. on December 4, 2003, and subsequently discovered that her car had been stolen when she returned to the parking lot at 6:15 p.m.

Defendant also telephoned her automobile insurer, Liberty Mutual Insurance Company (Liberty Mutual), to report that her car had been stolen. In that conversation, Fleischman stated that she and a friend arrived at the mall at 9:00 a.m. on December 4 and discovered at 6:30 p.m. that the car had been stolen. In response to questioning about the claim, she told her insurer that she still

---

[1] In fact, seven days earlier on November 27, 2003, defendant's car was discovered on fire in Brooklyn, New York. The fire marshall determined that the cause of the fire was arson.

possessed the automobile's keys and that she had not been trying to sell her car.

On December 12, 2003, defendant filed with Liberty Mutual an Automobile Theft Affidavit, in which she swore that the automobile had been stolen from the Menlo Park Mall parking lot, that she did not know the thief's identity, and that she had no information about the car's whereabouts. Fleischman's affidavit also stated that she did not own any other automobile and that her car had not been for sale.

Fleischman subsequently admitted that her car had not been stolen and withdrew her insurance claim.[2] A Middlesex County Grand Jury indicted defendant, charging her with second-degree insurance fraud, *N.J.S.A.* 2C:21–4.6; third-degree attempted theft by deception, *N.J.S.A.* 2C:20–4; third-degree tampering with public records, *N.J.S.A.* 2C:28–7(a)(2); and fourth-degree false swearing, *N.J.S.A.* 2C:28–2(a). Five acts of insurance fraud specifically were alleged to support the second-degree insurance fraud charge: (1) defendant's oral report to Liberty Mutual that her car was stolen; (2) her false affidavit submitted to Liberty Mutual in support of her claim; (3) her statement to the Edison Police that she arrived alone at the mall at 5:30 p.m. on December 4; (4) her contradictory statement that she arrived at the mall with a friend at 9:00 a.m. on December 4; and (5) her statements to Liberty Mutual that she did not own any other vehicles and that her Sebring was not for sale.

Defendant moved to dismiss her indictment in its entirety and, alternatively, to dismiss the second-degree insurance fraud count (Count One). The motion court found that the State presented only three acts of insurance fraud: defendant's fraudulent report to Liberty Mutual; the false affidavit that she submitted to Liberty Mutual; and defendant's fraudulent police report. Ac-

---

[2] During an interview with the New York fire marshall, defendant confessed that her car had not been stolen, that she had been trying to sell it without success, and that she had given the car to a friend to dispose of it for her.

cordingly, the court dismissed Count One, leaving intact the remaining charges.

On leave to appeal granted to the State, the Appellate Division affirmed Count One's dismissal, holding that "[e]ach lie told in support of one fraudulent claim in a single document cannot reasonably be seen as a separate act of insurance fraud, but rather only as a component of the one fraudulent claim." *State v. Fleischman*, 383 *N.J.Super.* 396, 405, 891 *A.2d* 1247 (2006). We granted leave to appeal. 187 *N.J.* 74, 899 *A.2d* 298 (2006).

## II.

In 1983, the Legislature passed the Insurance Fraud Prevention Act (IFPA), *N.J.S.A.* 17:33A–1 to –14, codifying the State's intent "to confront aggressively the problem of insurance fraud." *N.J.S.A.* 17:33A–2. The IFPA imposed stiff civil monetary penalties against perpetrators of insurance fraud. *See N.J.S.A.* 17:33A–5. In 2003, the Legislature added the crime of insurance fraud to the Code as part of "a comprehensive set of solutions to the automobile insurance availability and affordability challenges facing insurers, consumers and regulators in New Jersey." Assembly Banking and Insurance Committee, *Statement to Senate Subcommittee for Substitute for Senate Bill No. 63*, at 1 (May 5, 2003).

Pursuant to *N.J.S.A.* 2C:21–4.6(a), a person commits "insurance fraud" when one

> knowingly makes, or causes to be made, a false, fictitious, fraudulent, or misleading *statement* of material fact in … any record, bill, claim or other document, in writing, electronically, orally or in any other form, that a person attempts to submit, submits, causes to be submitted, or attempts to cause to be submitted as part of, in support of or opposition to or in connection with: (1) a claim for payment, reimbursement or other benefit pursuant to an insurance policy….
> [(Emphasis added).]

The offense is elevated from the third to the second degree when a person commits five or more acts of insurance fraud and the aggregate value of "property, services or other benefits obtained

or sought" exceeds $1,000. *N.J.S.A.* 2C:21–4.6(b). The statute further provides:

> Each act of insurance fraud shall constitute an additional, separate and distinct offense, except that five or more separate acts may be aggregated for the purpose of establishing liability pursuant to this subsection. *Multiple acts of insurance fraud which are contained in a single record, bill, claim, application, payment, affidavit, certification or other document shall each constitute an additional, separate and distinct offense for purposes of this subsection.*
> [*Ibid.* (emphasis added).]

Thus, the breadth of the phrase "act of insurance fraud" for grading purposes depends, in part, on the breadth of the term "statement," in subsection a. of the Act. We now must determine how the Legislature intended the term "statement" to be applied. The State argues that "statement" should encompass each fraudulent factual declaration within a single oral or written assertion or submission made in connection with a fraudulent claim. In contrast to that narrow reading of what should constitute a fraudulent act, defendant takes the position that "statement" should be generally coextensive with a person's narration or report submitted in connection with a claim.

### III.

In this exercise in statutory construction, our function is to effectuate legislative intent. To accomplish that purpose we look first to the words used by the Legislature in its enactment because, if the language is clear, a court's role is to apply the statute consistent with the plain meaning of the legislative choice of expression. *State v. Lewis,* 185 *N.J.* 363, 369, 886 *A.*2d 643 (2005). We give to "statutory words their ordinary meaning and significance." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citing *Lane v. Holderman,* 23 *N.J.* 304, 313, 129 *A.*2d 8 (1957)). In other words, we do not "rewrite a plainly-written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language." *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002). Rather, courts are to apply a statute as it has been enacted. *See In re Closing of Jamesburg High Sch.,* 83 *N.J.* 540,

548, 416 *A.*2d 896 (1980). However, when the statutory language is ambiguous and a fair reading of the words permits more than one reasonable interpretation, then we may turn to extrinsic interpretative aids, including legislative history and established canons of construction, for assistance in discerning the Legislature's intent. *See DiProspero, supra,* 183 *N.J.* at 494, 874 *A.*2d 1039; *Lozano v. Frank DeLuca Constr.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004).

In respect of the question before us, the State asserts that the Legislature clearly made the unit of prosecution a fraudulent "statement" and not the fraudulent "claim" by declaring that "[m]ultiple acts of insurance fraud which are contained in a single record ... shall each constitute an additional, separate and distinct offense for purposes of this subsection." *N.J.S.A.* 2C:21-4.6(b). Because each "statement of material fact" would constitute an "act" and multiple acts in a single document may be separate offenses, the State asserts that the Legislature intended prosecutors to dissect documents for "statements" of fraud. Before this Court, the State took the position that it presented to the grand jury evidence of nine specific fraudulent "statements," constituting nine acts of insurance fraud by defendant: (1) the report to the Edison police that she arrived at the mall at 5:30 p.m.; (2) the report to the police that she had discovered the theft when she returned to the parking lot at 6:15 p.m.; (3) the presentation of one set of keys to the police and representation that she had no others; (4) the oral report to Liberty Mutual that her car had been stolen from the mall on December 4; (5) the oral report to Liberty Mutual that she arrived at the mall at 9:00 a.m.; (6) the oral report to Liberty Mutual that all sets of keys were in her possession; (7) the oral report to Liberty Mutual that her car was not for sale; (8) the affidavit stating that the car had been stolen from the mall on December 4; and (9) the affidavit claiming that she did not know the identify of the thief or the whereabouts of the car. Defendant concedes that multiple documents or statements submitted in support of a fraudulent claim may be separate fraudulent "acts" and, further, that multiple acts of fraud may be

contained in a single document.[3] However, she says that the State's interpretation of "statement" fractionalizes single events or conversations, permitting criminal events to turn on a conversation's recordation or the speaker's syntax.

The parties' arguments highlight the inherent ambiguity in the Act's inclusion of a "false, fictitious, fraudulent, or misleading *statement* of material fact" as constituting an "act" of insurance fraud. That the term "statement" does not have a universal meaning permits the parties to advance their competing interpretations. Dictionaries define "statement" both as "a report or narrative" and as "a single declaration or remark." *Webster's Third New International Dictionary* 2229 (16th ed. 1971); *see also Funk & Wagnalls New Comprehensive International Dictionary* 1225 (8th ed. 1978) (defining "statement" as "a summary of facts; narration; the act of stating"); *Webster's Ninth New Collegiate Dictionary* 1151 (1991) (defining "statement" as "a report of facts or opinions" and as "a single declaration or remark").

In the criminal context, a "statement" has a variety of meanings. In criminal procedure, "statement" is commonly understood to refer to a narrative and not a single declaration, such as, for example, a criminal suspect's statement to police. *See, e.g., State v. Cook,* 179 *N.J.* 533, 847 *A.*2d 530 (2004); *State v. P.Z.,* 152 *N.J.* 86, 703 *A.*2d 901 (1997); *see also Black's Law Dictionary* 1416 (7th ed. 1999) (defining "statement" in criminal procedure as "[a]n account of a person's . . . knowledge of a crime"). In the context of perjury, which is a "false statement under oath," *N.J.S.A.* 2C:28–1, the Commentary to the Code takes the position that "statement" should mean each "item of information communicated in one sequence of declarations." II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commis-*

---

[3] Defendant conceded the latter by way of a hypothetical. She stated that had she asserted that her car held a fur coat in the trunk when the vehicle was stolen, even in a single report, then that single narrative statement could be parsed into two separate "acts" of insurance fraud.

*sion,* cmt. 5 on 2C:28-1, at 272–73 (1971). However, the Commentary also suggests that "statement" could be construed more "rigorously" so that each offense is committed "by each false statement made under the oath." *Ibid.*

No definition of "statement" answers the question posed by this appeal. *N.J.S.A.* 2C:21-4.6(a)'s reference to a "statement" is ambiguous, therefore, as to whether it was meant to be applied to discrete facts within a single narrative explanation, oral or written, in connection with an insurance claim. The ambiguity can be illustrated through the following hypothetical statement recited by a defendant to the police: "My car was stolen from the mall parking lot between 5:15 p.m. and 6:15 p.m. on December 4." Were we to accept the State's approach, we could find that the defendant made five separate false statements in one sentence: (1) the car was stolen; (2) from the mall parking lot; (3) after 5:15 p.m.; (4) before 6:15 p.m.; (5) on December 4. On the other hand, if we follow defendant's interpretation, only one false statement would have been uttered. Assuming further that the same defendant repeated that sentence to an insurance company, the State's interpretation would produce ten separate false statements and, thus, ten acts of fraud. We turn then to extrinsic evidence, such as "legislative history, committee reports, and contemporaneous construction" of related enactments, for assistance as to the Legislature's precise intent. *DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039 (quoting *Cherry Hill Manor Assocs. v. Faugno,* 182 *N.J.* 64, 75, 861 *A.*2d 123 (2004)).

The State urges that we consider the Legislature's strongly expressed desire to curb the rampant and expensive problem of insurance fraud by increasing the penalties for such behavior. When interpreting criminal statutes, "whatever be the rule of construction, it is subordinate to the goal of effectuating the legislative plan as it may be gathered from the enactment when read in the full light of its history, purpose and context." *Lewis, supra,* 185 *N.J.* at 369, 886 *A.*2d 643 (quoting *State v. Gill,* 47 *N.J.* 441, 444, 221 *A.*2d 521 (1966) (internal quotations omitted)). The

premise of the State's argument is that a narrow reading of "statement" would permit the finding of more "acts" of insurance fraud and, therefore, would allow the imposition of harsher punishment on individuals who submit false statements in connection with an insurance claim. Specifically, the Legislature stated:

a. Insurance fraud is inimical to public safety, welfare and order within the State of New Jersey. Insurance fraud is pervasive and expensive, costing consumers and businesses millions of dollars in direct and indirect losses each year....

b. The problem of insurance fraud must be confronted aggressively by facilitating the detection, investigation and prosecution of such misconduct, as well as by reducing its occurrence and achieving deterrence through the implementation of measures that more precisely target specific conduct constituting insurance fraud.

c. To enable more efficient prosecution of criminally culpable persons who knowingly commit or assist or conspire with others in committing fraud against insurance companies, it is necessary to establish a crime of "insurance fraud" to directly and comprehensively criminalize this type of harmful conduct, with substantial criminal penalties to punish wrongdoers and to appropriately deter others from such illicit activity.

[*N.J.S.A.* 2C:21–4.4(a) to (c).]

The State also points to the Health Care Claims Fraud Act (HCCFA), which expresses a similar legislative intention to curb aggressively health care insurance fraud. In the HCCFA, the Legislature created the offense of "health care claims fraud," which is "making, or causing to be made, a false, fictitious, fraudulent, or misleading statement of material fact in ... any record, bill, claim or other document." *N.J.S.A.* 2C:21–4.2. When the Legislature criminalized insurance fraud, it simultaneously amended the HCCFA using language similar to the Act. It made each "act" of health care claims fraud a separate and distinct offense and stated that "[m]ultiple acts of health care claims fraud which are contained in a single record, bill, claim, application, payment, affidavit, certification or other document shall each constitute an additional, separate and distinct offense." *N.J.S.A.* 2C:21–4.3(e). According to the State, were this Court to equate a "statement" with a narrative, we would make it more difficult to prosecute both automobile and health insurance fraud—a result that would be at odds with the Legislature's initiatives.

The State's arguments do not address the fact that the Legislature created two distinct offenses: third-degree insurance fraud and second-degree insurance fraud. *N.J.S.A.* 2C:21–4.6(b). Were "statement" to be interpreted as the State suggests, it would be difficult to envision a setting in which a violator could be charged with third-degree insurance fraud and not the second-degree offense. Even one sentence uttered in connection with a falsely submitted insurance claim, such as in the hypothetical example noted earlier, would permit the State to charge an individual with five acts of insurance fraud. Although it is evident that the Legislature intended to curb insurance fraud, we cannot ignore that the Legislature created two separate offenses of different degrees. It would be inappropriate to interpret the Act in a manner that leads to the absurd result of practically eliminating the third-degree offense. *See Lewis, supra,* 185 *N.J.* at 369, 886 *A.*2d 643 ("[A] court should strive to avoid statutory interpretations that lead to absurd or unreasonable results.").

■ In sum, we find that those extrinsic materials are of little assistance in resolving whether discrete facts within a single narrative advanced in furtherance of a fraudulent insurance claim should be considered individual fraudulent "acts." The legislative findings and declarations simply do not compel the interpretation that the State urges us to accept. Therefore, we turn to the established principle of statutory interpretation that the Legislature is presumed to act with knowledge of the judicial construction given to predecessor or related enactments. *See Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969).

IFPA, the predecessor to the instant criminal provision, addressed insurance fraud through the imposition of stiff civil penalties. Although civil in nature, IFPA punished the submission of a false or misleading "statement" through language essentially identical to that which now appears in the criminal statute. *N.J.S.A.* 17:33A–4. In *Merin v. Maglaki,* 126 *N.J.* 430, 599 *A.*2d 1256 (1992), we construed that IFPA language. We considered whether an individual who had submitted six documents in connection

with a fraudulent attempt to receive life insurance benefits for his wife could be held liable for each false statement submitted. *Id.* at 432, 599 *A.2d* 1256. We concluded that each document constituted a separate false statement in respect of the fraudulent claim. *Ibid.* Holding that the IFPA created a violation for false statements, not false claims, *id.* at 435, 599 *A.2d* 1256, we found that the defendant had submitted six false statements that were material to his fraudulent claim. *Id.* at 440, 599 *A.2d* 1256. As was noted by the Court in *Merin,*

> [t]he Commissioner [of Insurance] correctly asserts that each knowing and material false statement enhances a fraudulent claim, making the danger of payment more likely. Insurers often require a claimant to file several documents as supporting proof of a claim for benefits. Claimants frequently must present a "proof of loss" in the form of a detailed factual statement or statements to justify claims for benefits. Each additional statement further supports the credibility of the claim. Therefore, a claimant who makes a fraudulent claim in an initial documentation may well have subsequent opportunities to rectify previous misrepresentations when the insurer calls for further proof of loss.... [T]he person who persists in asserting a fraudulent claim by continuing to submit material misrepresentations compounds the evil that the legislature seeks to eliminate with the [IFPA]. Construction of the [IFPA] to penalize claims rather than component statements would produce the inequitable result of placing the State in the same position with respect to [the defendant] as it would be in with respect to a claimant who makes an initial false statement and then recants. Such a result fails to effectuate the legislature's intent that persons who file several false statements should be punished for each instance of prohibited conduct.

> [*Id.* at 437, 599 *A.2d* 1256.]

The holding in *Merin* acknowledged that the legislative intent to curtail insurance fraud would be effectuated by penalizing each false statement submitted to support a fraudulent claim, "provided that the false statement is material and significantly enhances the credibility of or evidentiary support for the claim." *Id.* at 439, 599 *A.2d* 1256. We added that

> it would be unreasonable to increase the penalty for each instance that the same misrepresentation appears in a single document or for false assertions that substantively repeat information contained in other misrepresentations in the *same* document. We are confident, however, that the Commissioner does not seek to stretch the limits of the [IFPA] that far.

> [*Ibid.* (emphasis added).]

Applying the standard it articulated, the *Merin* Court noted that defendant had submitted "six falsified documents: a claim form, an authorization to release information relating to his wife, a traffic-accident investigation report that purported to be a document prepared by the Manila Police Department, a certificate of death, a certificate of post-mortem examination, and a receipt for a burial permit." *Id.* at 433, 599 *A.*2d 1256. All six contained false and misleading facts concerning the alleged death of defendant's wife and expenses associated with her funeral and burial. *Ibid.* The Court concluded that each document was "material to the claim, and to have enhanced the credibility of the claim, and to have exacerbated [the insurer's] exposure to potential liability." *Id.* at 440, 599 *A.*2d 1256. There is no suggestion in the Court's analysis that it was basing its finding of six acts of fraud on discrete parsing of individual facts within the narrative contained in each document. Rather, the *Merin* holding reinforces that the violations were based on each submission of a knowing and material false statement in its totality, which significantly enhanced the credibility or evidence of the fraudulent claim.

We take the same approach to the Legislature's strikingly similar language concerning fraudulent statements of material fact that are now criminalized. The prior interpretation of the parallel language informs our perception of the Legislature's intention when it employed the same language and enhanced the scope of remedies available to combat insurance fraud. In light of the connection between the IFPA and the later crime of insurance fraud, defined in similar language, we conclude that the Legislature would have presumed, consistent with our *Merin* holding, that each document or narrative statement containing materially false facts would be held to be a separate "act" of insurance fraud. With that construction we effectuate the legislative intent to be tough on insurance fraud, but do so in a way that takes into consideration whether defendant reasonably should have been aware that three "acts" of insurance fraud would have been committed by knowingly making three reports of her loss that

repeated (albeit not in synchronicity) and augmented the asserted authenticity of her fraudulent claim. As noted, defendant concedes that the three statements she made in connection with her alleged stolen car claim constituted three acts of insurance fraud. *See supra* at 546–47, n. 3, 917 *A.*2d at 726, n. 3.[4]

To summarize, we reject the argument that more than five "acts" of insurance fraud were perpetrated by defendant when she made three statements in support of her fraudulent insurance claim. We hold that when a defendant provides to officials in connection with a fraudulent claim a document or oral narrative that contains a material fact or facts *relating to the claim*, each such document or narration is a "statement" equating to an "act" of insurance fraud. Although we recognize that there can be multiple "statements" in a single document or narration, for example when a document's or narration's contents relate to a

---

[4] Our concurring colleagues have a different take on the statute than that advanced either by us or by defendant. They assert that the Legislature's "use of the term 'aggregate value' clearly indicates ... that the Legislature contemplated that each criminal act of insurance fraud has a monetary value" and that, therefore, "only a fraudulent claim can be actionable." *Post* at 555, 917 *A.*2d at 732. Moreover, the legislative history of the Health Care Claims Fraud Act is asserted to support that reading. We disagree, first, that *N.J.S.A.* 2C:21–4.6(b)'s permissive aggregation of the value of the "property, services, or other benefit obtained or sought" requires that each fraudulent act must equate to a separate claim of additional value. Second, as to the Health Care Claims Fraud Act's legislative history, we note that it states otherwise about making statements actionable as fraudulent acts. Rather, that history affirms that the bill was meant to cover not only *claims* for treatment not provided, "but also false and misleading *statements*" concerning the necessity, nature, and scope of treatment. Senate Health Committee, *Statement to Senate Bill No. 2270*, at 1 (Dec. 11, 1997) (emphasis added). Finally, it bears noting that we do not reach and apply the rule of lenity because that rule of construction is a rule of default, applied when extrinsic sources do not resolve satisfactorily the alleged ambiguity—a circumstance unlike that which we find here. *See* 3 Norman J. Singer, *Sutherland Statutory Construction* § 59.3 at 133–34 (6th ed. 2001) ("[T]he possibility of articulating a narrower construction does not by itself make the rule of lenity applicable. The rule of lenity should only be applied if after reviewing all sources of legislative intent the statute still remains ambiguous."); *see also State v. Brannon* 178 *N.J.* 500, 509 n. 2, 842 *A.*2d 148 (2004).

separate claim of loss (the fur coat example), we reject the assertion that the Legislature intended every discrete fact within a narrative assertion about a single claim would amount to an "act" of insurance fraud. Because defendant's oral and written statements related to a single claim of a stolen automobile, we conclude that the State presented three "acts" of insurance fraud to the grand jury: defendant's report to the police, defendant's oral report of the alleged theft to Liberty Mutual, and defendant's affidavit submitted to Liberty Mutual in support of her claim.

## IV.

The judgment of the Appellate Division is affirmed for the reasons expressed in this opinion.

Justice LONG, concurring.

Because I do not believe that, in enacting *N.J.S.A.* 2C:21–4.4 to –4.7, the Legislature intended to criminalize every false document submitted by a defendant in connection with a single insurance claim, I write separately.

*N.J.S.A.* 2C:21–4.6(a) provides, in relevant part, that a person is guilty of the crime of insurance fraud if:

the person knowingly makes, or causes to be made, a false, fictitious, fraudulent, or misleading statement of material fact in ... any record, bill, claim or other document, in writing, electronically, orally or in any other form, that a person attempts to submit, submits, causes to be submitted, or attempts to cause to be submitted as part of, in support of or opposition to or in connection with: (1) a claim for payment, reimbursement or other benefit pursuant to an insurance policy....

At issue is whether each false claim, each false document, or each false statement, submitted by an insurance claimant, constitutes the act of insurance fraud proscribed by that statute.

Like the majority, I agree that the statutory definition, standing alone, is ambiguous and requires interpretation. I part company from my colleagues in connection with their concomitant conclusions that: (1) the legislative intent cannot be gleaned from the statute as a whole; and (2) that extrinsic evidence is of "little

assistance" in resolving the issue before us. I also disagree with the notion that our decision in *Merin v. Maglaki,* 126 *N.J.* 430, 599 *A.*2d 1256 (1992), sheds light on the subject.

My difficulty with the majority opinion begins with its failure to account for all aspects of *N.J.S.A.* 2C:21–4.6. In particular, that statute includes an aggregation provision that, to me, is the critical context clue in this case:

> b. Insurance fraud constitutes a crime of the second degree if the person knowingly commits five or more acts of insurance fraud, including acts of health care claims fraud pursuant to section 2 of *P.L.* 1997, c. 353 and if the *aggregate value* of property, services or other benefit wrongfully obtained or sought to be obtained is at least $1,000. Otherwise, insurance fraud is a crime of the third degree. Each act of insurance fraud shall constitute an additional, separate and distinct offense, except that five or more separate acts may be aggregated for the purpose of establishing liability pursuant to this subsection. Multiple acts of insurance fraud which are contained in a single record, bill, claim, application, payment, affidavit, certification or other document shall each constitute an additional, separate and distinct offense for purposes of this subsection.
>
> [*N.J.S.A.* 2C:21–4.6 (emphasis added) (internal citation omitted).]

In common parlance, to aggregate is to add together or total up. The very use of the term "aggregate value" clearly indicates that the Legislature contemplated that each criminal act of insurance fraud has a monetary value, otherwise there would be nothing to aggregate for the purposes of establishing liability by meeting the $1,000 threshold. If that is so, only a fraudulent claim can be actionable, not each document or lie submitted in support of such a claim. The final section of *N.J.S.A.* 2C:21–4.6 blends seamlessly with that view. It assures that there will be no "free" claims— rather multiple false claims contained in a single document, for example, the hypothetical provided by the majority opinion regarding a fur coat in the trunk of a stolen car, each with a monetary value, will constitute distinct offenses.

It may be that *Merin* properly interpreted the statute before it—the New Jersey Insurance Fraud Prevention Act (IFPA), *N.J.S.A.* 17:33A–1 to –14. However, I note that the IFPA was civil in nature, thus implicating a different interpretative rationale. More importantly, it is quite distinct from *N.J.S.A.* 2C:21–4.6 insofar as it does not include an aggregation provision. Those

differences between the IFPA and *N.J.S.A.* 2C:21–4.6 are critical and substantive and render *Merin* of little value here.

On the contrary, the Health Care Claims Fraud Act, *N.J.S.A.* 2C:21–4.2 to –4.3, passed in 1997, five years after *Merin,* is instructive. In defining the prohibited acts, that statute uses identical language to that before us:

> As used in this act: "Health care claims fraud" means *making, or causing to be made, a false, fictitious, fraudulent, or misleading statement of material fact in,* or *omitting a material fact from, or causing a material fact to be omitted from, any record, bill, claim or other document, in writing, electronically or in any other form, that a person attempts to submit, submits, causes to be submitted, or attempts to cause to be submitted for payment or reimbursement for health care services.*
>
> [*N.J.S.A.* 21:4–2.]

The Health Care Claims Fraud Act also has an aggregation provision similar the one before us:

> c. *A person,* who is not a practitioner subject to the provisions of subsection a. or b. of this section, *is guilty of a crime of the second degree if that person knowingly commits five or more acts of health care claims fraud and the aggregate pecuniary benefit obtained or sought to be obtained is at least $1,000.* In addition to all other criminal penalties allowed by law, a person convicted under this subsection may be subject to a fine of up to five times the pecuniary benefit obtained or sought to be obtained.
>
> . . . .
>
> e. Each act of health care claims fraud shall constitute an additional, separate and distinct offense, except that *five or more separate acts may be aggregated for the purpose of establishing liability pursuant to subsection c. of this section.* Multiple acts of health care claims fraud which are contained in a single record, bill, claim, application, payment, affidavit, certification or other document shall each constitute an additional, separate and distinct offense for purposes of this section.[1]
>
> [*N.J.S.A.* 2C:21–4.3.]

The one difference between the statutes is that the Health Care Claims Fraud Act has a legislative history that is neither sparse nor equivocal. Upon its enactment, that statute was accompanied by a full statement of the Senate Health Committee:

> Under this bill, it would be a crime of the second degree when a practitioner knowingly submits, or attempts to submit, *one fraudulent claim* or when a person

---

[1] The second sentence of § (e) was added in 2003 when the Legislature enacted *N.J.S.A.* 2C:21–4.6.

who is not a practitioner submits, or attempts to submit, *five or more fraudulent claims with an aggregate amount of at least $1,000.* It would be a crime of the third degree when a person who is not a practitioner knowingly submits, or attempts to submit, *one fraudulent claim.* The bill also creates lesser offenses applicable to reckless, rather than knowing, fraudulent conduct.

[S. Health Comm., *Statement to S. No. 2270,* at 1 (1997), cited in, *N.J.S.A.* 2C:21–4.2 cmt. (2005).]

Thus, in describing the import of a statute nearly identical to the one before us, the Legislature has declared that it criminalizes a fraudulent "claim" and not the individual documents or lies undergirding it.

In that respect, it is well-settled that when the Legislature uses the same term in cognate statutes (and there is no question but that the Health Care Fraud Claims Act and *N.J.S.A.* 2C:21–6 are of a piece), the term should be given the same meaning in both. *G.S. v. Dept. of Human Servs., Div. of Youth & Family Servs.,* 157 *N.J.* 161, 172, 723 *A.*2d 612 (1999); *State v. Federanko,* 26 *N.J.* 119, 129, 139 *A.*2d 30 (1958); *State v. Brown,* 22 *N.J.* 405, 415, 126 *A.*2d 161 (1956). There is simply nothing in the statutes to suggest that the Legislature intended the identical definitions in *N.J.S.A.* 2C:21–4.6 and the Health Care Claims Fraud Act to mean different things. Because the Legislature has spoken regarding the meaning of the language in the Health Care Claims Fraud Act and declared the proscribed conduct to be the fraudulent claim and nothing less, that is the meaning to be ascribed to the statute in this case.

Finally, even if I were to agree that the majority view is a plausible one, the rule of lenity would require that this penal statute be strictly construed in favor of defendants, thus compelling the interpretation I here advance. *State v. Alexander,* 136 *N.J.* 563, 643 *A.*2d 996 (1994); *State v. Sutton,* 132 *N.J.* 471, 625 *A.*2d 1132 (1993). For those reasons, I concur only in the result reached by the majority.

Justice ALBIN joins in this opinion.

558 

*For affirmance*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.