NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

```
------------------------------------------------------x
SENIOR CITIZENS UNITED                   :
COMMUNITY SERVICES, INC.,                 :  DOCKET NO:   008789-2019
                                          :               005999-2020[1]
          Plaintiff,                      :
                                          :
          v.                              :
                                          :
DIRECTOR, DIVISION OF TAXATION,           :
                                          :
          Defendant.                      :
                                          :
------------------------------------------------------x
```

Approved for Publication
In the New Jersey
Tax Court Reports

Decided:  July 1, 2021

Dale W. Keith for plaintiff (Keith & Keith, LLC, attorneys).

Jamie M. Zug for defendant (Gurbir S. Grewal, Attorney General of New Jersey, attorney).

CIMINO, J.T.C.

Plaintiff, Senior Citizens United Community Services, Inc. (SCUCS) is a New Jersey non-profit corporation providing special and rural transportation services through contracts with New Jersey Transit and county governments.  SCUCS seeks a refund of the Motor Fuel Tax and the Petroleum Products Gross Receipt Tax paid on fuel purchased to provide the transportation services.  Defendant, Director of the

---

[1]  A jurisdictional question has been raised for the refund period of January 2019 through July 2019.  This decision does not address any refund for this period of time.

Division of Taxation (Director) denied the refund applications and the within action ensued. For the reasons set forth in greater detail below, SCUCS is entitled to a refund of the Motor Fuel Tax and Petroleum Products Gross Receipts Tax while providing certain special or rural bus services.

I.

A.

SCUCS, through contracts with New Jersey Transit and two counties, provides special and rural transportation for senior citizens and the disabled. Transportation is provided for employment, mall shopping, non-emergency medical, nutrition site, personal business, sheltered workshop, shopping and special events.

In some counties in New Jersey, the services are provided directly by the counties. However, Burlington and Camden counties have opted for SCUCS to provide these services. Funding for SCUCS' services is provided through the state Senior Citizen and Disabled Resident Transportation Assistance Act, L. 1983, c. 578, (codified as N.J.S.A. 27:25-25 to -34), federal formula grants for the enhanced mobility of seniors and individuals with disabilities, 49 U.S.C. §5310, and federal formula grants for rural area transportation, 49 U.S.C. § 5311.

SCUCS entered one-year contracts with two local gas stations to purchase fuel at retail with payments remitted monthly. In addition, SCUCS obtained a credit card account with a third retail vendor. SCUCS sought refund of both the Motor Fuel

Tax as well as the Petroleum Products Gross Receipts Tax. The Director denied the refunds and SCUCS filed the instant appeals.

SCUCS moves for summary judgment as to eligibility for the refunds. The Director cross-moves for summary judgment. Our Supreme Court has indicated that summary judgment provides a prompt, business-like and appropriate method of disposing of litigation in which material facts are not in dispute. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530 (1995). Since there are not any material facts in dispute, the matter is ripe for summary judgment.

B.

"The judicial goal [when interpreting a statute] is to carry out fairly the legislative purpose and plan, and history and contemporaneous construction may well furnish important light as to that purpose and plan." Bernhardt v. Alden Café, 374 N.J. Super. 271, 279 (App. Div. 2005). "Statutes cannot be read in a vacuum void of relevant historical and policy considerations and related legislation." Borough of Matawan v. Monmouth Cnty. Bd. of Tax'n, 51 N.J. 291, 299 (1968). Helfrich v. Township of Hamilton, 182 N.J. Super. 365, 370 (App. Div. 1981). "Regardless of whether the language is plain or whether ambiguities cause us to seek guidance from sources other than the words the Legislature has chosen, our primary task is to effectuate the legislative intent in light of the language used and the objects sought to be achieved." Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 554 (2009).

-3-

The issue in this case is whether the transportation services provided by SCUCS satisfy the statutory requirements for the exemption from taxes on the fuel purchased. Both the Motor Fuel Tax and the Petroleum Products Gross Receipts Tax provide that certain types of bus service are exempt from taxes. Both statutes use the word "autobus." The parties disagree over whether a definition of the word "autobus" as found in Title 48 (Public Utilities) is incorporated into Title 54 (Taxation).

The Director argues that to obtain the exemption, SCUCS must operate an "autobus" as that term is defined in N.J.S.A. 48:4-1 of Title 48 (Public Utilities). The Director further argues that the term "autobus" was amended in 1992 to explicitly exclude "special paratransit vehicles" which are defined to include vehicles used by a county special or rural bus service transporting senior citizens and the disabled. See N.J.S.A. 48:4-1. The Director goes on to reason that since SCUCS is providing paratransit services, it is not operating an autobus and thereby not eligible for the exemption. The Director also argues that SCUCS is not providing regular route service and is thereby not eligible.

SCUCS argues that the definition of autobus found in N.J.S.A. 48:4-1 of Title 48 is not incorporated into Title 54. The purpose of the paratransit amendment is to free organizations such as SCUCS from the costs associated with implementing certain regulatory obligations sought to be imposed by the New Jersey Department

-4-

of Transportation. The paratransit amendment is not intended to increase the costs of providing special and rural bus service which would result from denial of the exemption. Further, SCUCS is not required to operate regular route service to obtain the exemption.

The pertinent part of the current version of the exemption statute provides as follows:

> Fuel used for the following purposes is exempt from the tax imposed by the "Motor Fuel Tax Act" . . . :
>
> [] Autobuses while being operated over the highways of this State in those municipalities to which the operator has paid a monthly franchise tax for the use of the streets therein under the provisions of R.S. 48:16-25 and autobuses while being operated over the highways of this State in a regular route bus operation as defined in R.S. 48:4-1 and under operating authority conferred pursuant to R.S. 48:4-3, or while providing bus service under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation pursuant to P.L. 1979, c. 150 (C. 27:25-1 et seq.), and autobuses providing commuter bus service which receive or discharge passengers in New Jersey. For the purpose of this paragraph "commuter bus service" means regularly scheduled passenger service provided by motor vehicles whether within or across the geographical boundaries of New Jersey and utilized by passengers using reduced fare, multiple ride or commutation tickets and shall not include charter bus operations for the transportation of enrolled children and adults referred to in subsection c. of R.S. 48:4-1 and "regular route service" does not mean a regular route in the nature of special bus operation or a casino bus operation,

[N.J.S.A. 54:39-112(a)(1).]

On its face and without the valuable context provided by the legislative history, the statute is confusing and not a model of clarity. The one sentence which is central to the dispute is 112 words long and contains ten conjunctions including three "ands," four "ors" and three "whiles." The parties have spent much time arguing over the function of each conjunction in defining the exemptions. The legislative history of this provision reveals that it did not start out this way, but rather was the product of multiple amendments over more than a half-century. While the task is tedious, only by walking through the legislative history starting with the original motor fuel tax enactment in 1927, can the court fully appreciate the intent of the Legislature.

## II.

## A.

With growing use of motor vehicles and the need to improve the roads traveled upon, New Jersey instituted a tax on motor fuels in 1927.[2] L. 1927, c. 334, § 4 (tax), § 8 (revenues appropriated for construction and maintenance of state

---

[2] Initially the tax imposed was two cents on every gallon sold. Id. at § 4. Over the years the tax has increased from two cents a gallon in 1927 to the current rate of 10.5 cents per gallon for gasoline. Compare L. 1927, c. 334, § 4, with L. 2010, c. 22, § 3 (codified as N.J.S.A. 54:39-103(a)(1)(a)).

highways). Bus transportation was exempt so long as a municipal franchise tax of five percent on gross receipts was paid. Id. at § 1. The franchise tax was established some eleven years earlier in 1916 when the Legislature enacted the Kates' Act which allowed municipalities to regulate the rapidly growing popularity of bus transportation. L. 1916, c. 136. Public Service Railway Co. v. General Omnibus Co., 93 N.J.L. 344, 345 (Sup. Ct. 1919). See generally Ross D. Eckert and George W. Hilton, The Jitneys, 15 J. of L. & Econ. 293 (1972).

The Motor Fuel Tax underwent a comprehensive revision and was reenacted in 1935. L. 1935, c. 319. The listing of exemptions was arranged in the form which patterns the current statute. Id. at 1202. Shortly after the 1935 adoption, all of New Jersey's statutes were codified into the Revised Statutes (R.S.). L. 1937, c. 188. The bus service exemption then specified:

> Any person who shall use any fuels . . . for any of the following purposes: . . .
>
> [] Autobuses while being operated over the highways of this state in those municipalities to which the operator has paid a monthly franchise tax for the use of the streets therein under the provisions of sections 48:4-14, 48:4-15 and 48:4-16 or 48:16-25 of the title Public Utilities,
>
> [R.S. 54:39-66(b).]

With the codification, the Legislature refined the general exemption for bus transportation into two specific exemptions. One exemption was for service

primarily regulated by the State under Chapter 4 of Title 48; the other exemption was for jitney bus service primarily regulated by municipalities under Chapter 16 of Title 48. R.S. 54:39-66(b) (1937). Both exemptions required payment of the municipal franchise tax to qualify for the exemption. The bus service exemptions remained unchanged until 1972. Compare R.S. 54:39-66(b) (1937) with N.J.S.A. 54:39-66(1)(b) (1971) (repealed and replaced with N.J.S.A. 54:39-112(a)(1)).[3]

By 1972, the Legislature was facing a different challenge. With the rise of private automobile transportation, bus service in New Jersey was in dire straits. Continental Trailways, Inc. v. Dir., Div. of Tax'n, 102 N.J. 526, 533 (1986). To encourage public bus transportation, the Legislature eliminated the municipal franchise tax for certain regular route bus service. Ibid. L. 1972, c. 211, § 5. See also Trailways, Inc. v. City of Atlantic City, 179 N.J. Super. 258, 270 (Law Div. 1980) (discussing legislative history). The statute, as amended, then read as follows:

> Any person . . . who shall use any fuels . . . for any of the following purposes: . . .
>
> autobuses while being operated over the highways of this State in those municipalities to which the operator has paid a monthly franchise tax for the use of the streets therein under the provisions of R.S. 48:16-25 of the Title Public

---

[3] A rewrite of the motor fuel tax provisions in 2010 sought to increase compliance by streamlining collection of the tax. A. Budget Comm. Statement to A. 3014 (Jan. 24, 2010). The laundry list of exemptions originally provided in N.J.S.A. 54:39-66 was re-codified as N.J.S.A. 54:39-112. L. 2010, c. 22, §12 (N.J.S.A. 54:39-112), § 56 (repeal of N.J.S.A. 54:39-66) (Technical corrections L. 2010, c. 79, §§ 11, 57).

Utilities, and autobuses while being operated over the highways of this State to provide regular route passenger service under operating authority conferred pursuant to R.S. 48:4-3.

[L. 1972, c. 211, § 3.]

This was the established form of the bus service exemptions until an amendment in 1985 which added the exemption for special or rural bus services.[4]

B.

Concurrent with the efforts of the Legislature to increase bus transportation, there was also a legislative push by Congress in the 1970s to ensure the greater availability of bus service for certain individuals. Congress authorized funds to provide grants to support special transportation for senior citizens and the disabled, as well as grants to enhance rural transportation.[5][6]

---

[4] There were slight changes in 1975 and 1983. L. 1975, c. 314, § 2. L. 1983, c. 264, § 5. Neither of these changes is material.

[5] Congress enacted the Federal-Aid Highway Act of 1973, Pub. L. No. 93-87, 87 Stat. 250, amending section 16(b) of the Urban Mass Transportation Act of 1964 "to make grants and loans . . . providing transportation services meeting the special needs of elderly and handicapped persons . . ." Federal-Aid Highway Act, § 301(g), 87 Stat. at 295-96 (codified as 49 U.S.C. § 1612(b) (repealed 1994)) (emphasis added). The section was later revised and recodified and now reads "[t]he Secretary may make grants . . . for . . . public transportation projects . . . to meet the special needs of seniors and individuals with disabilities . . . ." 49 U.S.C. § 5310(b)(1)(A) (emphasis added).

[6] Congress added section 18 to the Urban Mass Transportation Act in 1978 to provide "grants for the initiation, improvement, or continuation of intercity bus service for residents of rural areas . . ." Federal Public Transportation Act of 1978, Pub. L. No. 95-599, § 323, 92 Stat. 2689, 2754-55 (codified as 49 U.S.C. § 1618

In 1979, the Governor's Task Force on Transportation Services for Elderly and Handicapped Persons issued a report recommending that the State take a lead role in coordinating social service and paratransit operations, and that each county have a transportation coordination office. Governor's Task Force on Transportation Services for Elderly and Handicapped Persons, <u>Coordinating Specialized Transportation Services in New Jersey</u> 3 (1979). This role included coordinating the funding received from the federal government for both special and rural transportation services. <u>Id.</u> at 8. The people of New Jersey approved an amendment to the Constitution in 1980 to expand the use of Atlantic City gambling tax revenues to provide "additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents . . . ." <u>N.J. Const.</u> art. IV, § 7, ¶ 2D.

Having both federal and state funding, the Legislature enacted the Senior Citizen and Disabled Resident Transportation Assistance Act. <u>L.</u> 1983, <u>c.</u> 578. The Legislature required New Jersey Transit establish and administer the Senior Citizen and Disabled Resident Transportation Assistance Program. N.J.S.A. 27:25-28(a). New Jersey Transit Corporation had been established in 1979 as a statewide public

---

(repealed 1994)) (emphasis added). The section was later revised and recodified and now reads "the Secretary may award grants . . . in <u>rural</u> areas for" various types of public transportation projects. 49 U.S.C. § 5311(b)(1) (emphasis added). To summarize, with the 1973 and 1978 enactments, the federal government took an active role in providing assistance for special and rural transportation.

-10-

transit system, owning, operating and funding various modes of transportation. L. 1979, c. 150, N.J.S.A. 27:25-1 to 27:25-24.

The policies of the program include "assist[ing] counties to develop and provide accessible feeder transportation service to accessible fixed-route transportation services . . . and accessible local transit service to senior citizens and the disabled, [including] door-to-door service, fixed route service, local fare subsidy and user-side subsidy . . . ." N.J.S.A. 27:25-28(a). To receive funding for the program, a county must develop a county plan for assistance in accordance with program guidelines. N.J.S.A. 27:25-30. Funds from the Casino Revenue Fund are appropriated to support the program. N.J.S.A. 27:25-28(b). The law did not specify if, and how, the counties could have third party providers operate the programs.

C.

If there was any doubt whether the Legislature intended to have third parties operate county senior and disabled transportation programs, that was cleared up by S. 131 (1984) which became L. 1985, c. 207 (Chapter 207). S. 131 provided that third party operators would be exempt from the Motor Fuel Tax while providing service "under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation . . . ." See L. 1985, c. 207, § 2. S. 131 was pre-filed in early January 1984, for consideration in the next Legislative

session which began January 10, 1984.  Shortly after S. 131 was pre-filed, the Senior

Citizens and Disabled Resident Transportation Assistance Act was signed into law

on January 17, 1984.  L. 1983, c. 578.

If there was no intent to have third party operators of the program, S. 131

would not have been necessary since the counties as governmental entities were

already exempt from the motor fuel tax.  N.J.S.A. 54:39-65 (repealed and replaced

with N.J.S.A. 54:39-112(b)(3)).  S. 131 became Chapter 207 when it was signed into

law by the Governor on June 27, 1985.[7]  L. 1985, c. 207.  Overall, Chapter 207 works

in tandem with the Senior Citizens and Disabled Resident Transportation Assistance

Act to enable a county to utilize a third-party provider and still realize the economy

of providing the service without the additional expense of the Motor Fuel Tax.

D.

Chapter 207 not only added an exemption for special and rural transportation,

but also added an exemption for commuter bus service.  With the doubling of

exemptions from two to four, the sentence defining the bus fuel tax exemptions also

doubled from 57 to 112 words, and the number of conjunctions increased as well.

---

[7]  While S. 131 was still pending, regulations proposing procedures to implement the already approved Senior Citizens and Disabled Resident Transportation Assistance Act, including third party operation by entities such as SCUCS, were proposed by New Jersey Transit on June 17, 1985.  17 N.J.R. 1532 (Jun. 17, 1985).  The regulations were effective October 7, 1985.  17 N.J.R. 2445 (Oct. 7, 1985).

However, parsing this sentence into the four component exemptions plainly reveals the intent of the Legislature.

The first original exemption provides:

> Autobuses while being operated over the highways of this State in those municipalities to which the operator has paid a monthly franchise tax for the use of the streets therein under the provisions of <u>R.S.</u> 48:16-25
>
> [N.J.S.A. 54:39-66(1)(b) (repealed and replaced with N.J.S.A. 54:39-112(a)(1).]

This exemption covers what is known as jitney service which is limited to a single municipality serving 13 or fewer passengers or four municipalities in certain counties serving 20 or fewer passengers. N.J.S.A. 48:16-23. Jitney service providers are required to pay a franchise tax of five percent of gross revenues to the municipalities in which they operate, and the service is primarily regulated by the municipality. N.J.S.A. 48:16-25.

The second original exemption is for regular route bus service and was specified at the time of adoption of Chapter 207 [8] as:

> and autobuses while being operated over the highways of this State to provide regular route passenger service under operating authority pursuant to <u>R.S.</u> 48:4-3
>
> [<u>L.</u> 1985, <u>c.</u> 207, § 2.]

---

[8] This language of this exemption changed in 1987. <u>See</u> infra p. 22.

Regular route service is generally defined as bus service on a regular route between fixed termini. See N.J.S.A. 48:4-1. In addition, operating authority is required from the State in the form of a certificate of public convenience and necessity.[9] [10] [11] N.J.S.A. 48:4-3.

---

[9] Initially the certificate was issued by the Board of Public Utilities. Regulation of bus transportation was transferred from the Board of Public Utilities to the Department of Transportation effective in 1979. Reorganization Plan for the Board of Public Utilities and the Department of Transportation. Acts of the 1st Ann. Sess. of the 198th Legis. 995 (1978). In 2007, the regulation of bus transportation was transferred to the Motor Vehicle Commission. L. 2007, c. 13, § 1 (codified as N.J.S.A. 48:4-3). New Jersey Transit does not require a certificate of public convenience and necessity to operate a bus route. N.J.S.A. 27:25-8(b).

[10] Prior to 1973, both State and municipal consent for operation was required for pick-up and drop-off in a municipality. In an apparent attempt to increase bus service, the Legislature eliminated municipal consent. L. 1973, c. 158 § 11. N.J.S.A. 48:4-10 (repealed).

[11] Regulation of interstate bus service by the states is limited. Applying the dormant Commerce Clause, the United State Supreme Court initially limited the reach of state regulation to health and safety concerns under the dormant commerce clause. Buck v. Kuykendall, 267 U.S. 307 (1925). Later, Congress, using its affirmative powers to regulate interstate commerce, promulgated the Motor Carrier Act of 1935 placing the jurisdiction of interstate bus transportation with the Interstate Commerce Commission. Motor Carrier Act of 1935, 74 Pub. L. 498, 49 State. 543. Congress later deregulated interstate bus transportation in 1982. Bus Regul. Reform Act of 1982, Pub. L. No. 97-261, 96 Stat. 1102. Besides significantly deregulating interstate transportation, the act allowed the Interstate Commerce Commission (ICC) to approve intrastate bus service in certain instances. 49 U.S.C. § 10922(c) (repealed). See Funbus Systems, Inc. v. Cal. Pub. Util. Comm., 801 F.2d 1120, 1126-29 (9th Cir. 1986). However, a specific provision of the act allowed New Jersey to regulate buses to Atlantic City casinos. See Hudson Transit Lines, Inc. v. Interstate Commerce Comm'n, 765 F.2d 329, 342-43 (2d Cir. 1985) (citing 49 U.S.C. § 10922(c)(2)(H)) (repealed). There were complaints that this carve-out was ignored by the ICC. Oversight of the Bus Regul. Reform Act of 1982, Hearing

With the expanding policy goals of the Legislature to support bus transportation, the 1985 enactment of Chapter 207 replaced the period at the end of the aforesaid section with a comma, and then added two more exemptions. One exemption is for special and rural transportation and the other is for commuter bus service. The third exemption provided by Chapter 207, and addressing special or rural transportation specifies:

> or while providing bus service under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation pursuant to P.L. 1979, Ch. 150, (C. 27:25-1 et. seq.)
>
> [L. 1985, c. 207, § 2.]

A discussion of how county special or rural transportation services subject to the jurisdiction of New Jersey Transit Corporation came to be under the Senior

---

Before the S. Subcomm. on Surface Transp. of the Comm. on Com., Sci., & Transp., S. Hrg. 98-518, 98th Cong. 102 (1983). This carve-out was further clarified in 1987. Federal Mass Transportation Act of 1987, Pub. L. No. 100-17, 101 Stat. 132, § 340 (amending 49 U.S.C. § 10922(c)(2)). Congress abolished the Interstate Commerce Commission in 1995 and transferred most of its responsibilities to the Secretary of Transportation. ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803. However, the Federal Motor Carrier Safety Administration was later established to oversee safety regulation. Motor Carrier Safety Improvement Act of 1999, Pub. L. No. 106-159, 113 Stat. 1748.
Needless to say, there was much activity involving the regulation of bus transportation during the 1980s into the 1990s.

Citizen and Disabled Transportation Assistance Act is addressed earlier in this opinion.

Chapter 207 then continues with a fourth exemption for commuter bus service by indicating:

> and autobuses providing commuter bus service which receive or discharge passengers in New Jersey. For purposes of this paragraph "commuter bus service" means regular scheduled passenger bus service provided by motor vehicles whether within or across the geographical boundaries of New Jersey and utilized by passengers using reduced fare, multiple ride or commutation tickets and shall not include charter bus operations or special bus operations as defined in R.S. 48:4-1 or buses operated for the transportation of enrolled children and adults referred to in subsection c. of R.S 48:4-1,
>
> [L. 1985, c. 207, § 2.]

Previously, only intrastate regular route service regulated by the State was exempt per the second exemption set forth above. With Chapter 207, the exemption is expanded to commuter bus service, regardless of whether intrastate or interstate service. At the time of enactment, the Legislature was exploring ways to enhance commuter bus service. Pub. Hearing Before the S. Transp. & Commc'ns Comm. on Bus Transp. in N. J. 12, 37 (Mar. 19, 1984).

To summarize, with the amendments provided by Chapter 207 in 1985, the Legislature expanded the categories of motor fuel tax exemption for bus transportation from two categories to four. The first category is the local jitney bus

service.  The second category is regular route intrastate bus service operating under a certificate of public convenience and necessity issued by the State per N.J.S.A. 48:4-3.  The third category is service under contract with New Jersey Transit or service under contract with the county to provide special or rural transportation subject to New Jersey Transit jurisdiction.[12]  The fourth category is commuter bus service whether interstate or intrastate.[13]

E.

The Director asserts that the word "autobus" as taken from the second category of exemption for regular route service is part of the third category defining special or rural transportation services.  Specifically, the Director argues that the exemption for special or rural service applies to "autobuses . . . while providing bus service . . . ."

For starters, it is unclear whether the word "autobus" mentioned at the beginning of the second exemption covering regular route service is incorporated

---

[12]  The court is not determining and need not determine whether the provision is actually two provisions, the first being for any type of service under contract with New Jersey Transit, and the second being under contract with a county if providing special or rural bus service under the jurisdiction of New Jersey Transit.  Whether treated as one exemption or two, the outcome under the facts of this case is the same.

[13]  For completeness, there is a fifth category of exemption for bus transportation provided by a governmental entity which is covered by a different provision.  N.J.S.A. 54:39-65 (repealed and replaced with N.J.S.A. 54:39-112(b)(3)).  This would encompass New Jersey Transit as a governmental agency.  N.J.S.A. 27:25-4(a).  See also N.J.S.A. 27:25-16 (New Jersey Transit exempt from state taxes).

into the third category exempting special and rural transportation services. If the first two categories were excised from the statute, as well as the connecting "or" that starts off the third category provided by Chapter 207, the third category would simply indicate "while providing bus service under a contract with . . ." While beginning an exemption with the word "while" can be construed as awkward, the description of the special and rural transportation exemption is nevertheless complete and makes sense. This construction would mark the swift end of the Director's argument.

However, the ultimate goal is for the court to ensure that it is fulfilling the will of the Legislature. To be assured, the third exemption must also be considered with the incorporation of the word "autobus." As more fully set forth below, even with the incorporation of the word "autobus" into the third exemption, no definition of "autobus" from Title 48 is incorporated.

With the word "autobus" as part of the third exemption, the exemption goes on to plainly describe with particularity the type of exemption-qualifying "bus service" provided by an autobus. L. 1985, c. 207, § 2. N.J.S.A. 54:39-66(1)(b) (repealed and replaced with N.J.S.A. 54:39-112(a)(1)). Pointedly, the exemption is for bus service provided "under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation . . . ." Ibid. This

third exemption focuses on the service provided, not the type of bus. The second original exemption also focuses on the service provided, namely, regular route service. This is also true for the first exemption, jitney service, as well as the fourth exemption, commuter bus service.[14] Looking broadly at the current exemption statute, it begins with "[f]uel used for the following purposes is exempt . . . ." N.J.S.A. 54:39-112. The emphasis of the statute is on the service, not the vehicle.

The legislative focus on the type of service is longstanding. Upon initial codification in 1937, the Legislature declared the exemption applicable to autobuses which paid the franchise tax per Title 48. It did not classify the type of bus, but rather the bus service provided and whether the bus paid the franchise tax. R.S. 54:39-66 (1937). Even the 1935 version of the exemption statute, upon which the 1937 codification was based, does not define autobus, but rather defines the exemption as those autobuses which pay the franchise tax. L. 1935, c. 319, § 1202. Later, with the 1972 amendment limiting the application of the franchise tax, the exemption still applied if the service was regular route. L. 1972, c. 211, § 3.

---

[14] While it certainly true that jitney bus service is limited by the number of passengers, that is not dispositive for defining jitney service. For example, a smaller bus with service covering more than four municipalities would not be considered as providing jitney service, since jitney service is limited to no more than four municipalities. N.J.S.A. 48:16-23.

The Director attempts to divorce the statutory language from the statutory history to create an interpretation which is contrary to the intent of the Legislature along with insisting that autobus is part of the definition defining the special and rural transportation exemption. The Director wants to incorporate a definition of autobus found in Title 48 into Title 54. Specifically, the Director seeks to incorporate the definition in N.J.S.A. 48:4-1. This is one of three definitions of autobus found in Title 48. See N.J.S.A 48:4-2.20, 4-1, 16-23. The Director does not explicitly posit a reason for picking this particular definition. It could be that the definition in Chapter 4 of Title 48 deals with regular route bus service. However, one of the other definitions of autobus, found at N.J.S.A. 48:4-2.20, also applies to regular route service. SCUCS counters that the definitions of autobus found in Title 48 are not applicable.

By its very definition, the term autobus in N.J.S.A. 48:4-1 is confined to Chapter 4 of Title 48.[15] N.J.S.A 48:4-1 ("The term 'autobus' as used in this chapter means . . . .") In adopting Chapter 207 in 1985, if the Legislature wanted to apply a definition of autobus found in Title 48 to the third category of exemption, special or rural transportation services, it could have easily done so. In fact, the Legislature in

---

[15] Likewise, for jitney service, the definition of autobus is set forth in N.J.S.A. 48:16-23. That definition indicates that it only applies to Article 3 of Chapter 16 of Title 48 concerning jitneys. N.J.S.A. 48:16-23. The definition of autobus in N.J.S.A. 40:4-2.20 only applies to N.J.S.A. 48:4-2.20 to -2.25. L. 1983, c. 517.

Chapter 207 did indicate when it wanted to incorporate definitions from N.J.S.A. 48:4-1.  For the fourth exemption category, commuter bus service, which was also adopted as part of Chapter 207, the Legislature specifically excepted charter bus operations and special bus operations "as defined in R.S. 48:4-1" and school buses "referred to in . . . R.S. 48:4-1" from the exemption.  L. 1985, c. 207, § 2.

To further clarify the plain words of the enactment, the legislative statements accompanying Chapter 207 plainly indicate the desire to exempt "any bus carrier under contract with New Jersey Transit or under contract with a county for special or rural transportation subject to New Jersey Transit shall . . . be exempt [from the excise tax]" and "carriers which receive the receive excise tax exemption . . . shall be reimbursed and repaid the motor fuel tax paid." [16]  S. Revenue, Fin. & Appropriations Comm. Statement to S. 131 (Feb. 14, 1985).  See also A. Transp. & Commc'ns Comm. Statement to S. 131 (Mar. 25, 1985); A. Revenue, Fin. & Appropriations Comm. Statement to S. 131 (May 13, 1985).  In addition, at the time of signing, the governor's office indicated the legislation "provides tax relief for . . . bus service under contract to New Jersey Transit, by exempting these services from . . . the Motor Fuels Tax."  Office of the Governor, News Release (June 28, 1985).

---

[16] Chapter 207 also eliminated the Excise Tax and the Motor Fuel Use Tax for special and rural service and commuter service.  L. 1985, c. 207, §§ 1, 3.

-21-

To now claim the exemption does not apply would be contrary to both the plain language as well the legislative history of the act.

A 1987 amendment to the bus fuel tax exemption provision further demonstrates that when the Legislature sought to include a Title 48 definition in the fuel tax exemption provision, it did so explicitly. The legislature changed the second original category of exemption to read:

> and autobuses while being operated over the highways of this State in a regular route bus operation as defined by R.S. 48:4-1 and under operating authority conferred pursuant to R.S. 48:4-3
>
> [L. 1987, c. 445, § 5]

The purpose of the change is to distinguish regular route service from casino, special and charter operations.[17] Previously, casino buses were regulated as regular route service. A. Transp., Commc'ns & High Tech. Comm. Statement to S. 64 (Mar. 12, 1987). The committee felt "they are closer in most respects to special buses." Ibid. With the change "casino bus operations [would be] on the same basis as charter and special operations with respect to taxes and fees. Buses in this new category would no longer be exempt from the motor fuel tax [as regular route buses] . . . ." Ibid.

The amendment refined the term "regular route passenger service" to now read "regular route bus operation as defined by R.S. 48:4-1." L. 1987, c. 445, § 5.

---

[17] There was an ongoing issue over between the State and Federal governments as to regulation of Atlantic City casino bus traffic. See fn. 11, supra.

Concurrently, a definition for "regular route bus operation" was added to N.J.S.A. 48:4-1. L. 1987, c. 445, § 1. Once again, when the Legislature sought to incorporate a definition from Title 48, it did so explicitly. Moreover, if there is any doubt as to the statutory language, the legislative history plainly reveals the change is aimed at removing the fuel tax exemption from casino buses which were considered part of the second category, not rural and special transportation in the third category.

A 1992 amendment to the autobus definition of N.J.S.A. 48:4-1 is at the heart of Director's argument. The amendment excepts paratransit vehicles from the definition of autobus found in N.J.S.A. 48:4-1. The origin of the amendment arises from "[t]he D[epartment] o[f] T[ransportation] . . . notif[ying] county and non-profit paratransit agencies that since donations are accepted by the agencies for their services, they will be subject to the laws and regulations concerning autobuses." [18] A. Transp. & Commc'n Comm. Statement to A. 1764 (Dec. 3, 1992). As regulated autobuses, the "vehicles would require separate DOT vehicle inspections, omnibus license plates and retrofitting of equipment not essential to the provision of paratransit service. In addition, the vehicles would be subject to additional insurance requirements from which New Jersey Transit buses are already exempted." Ibid.

---

[18] It is not clear whether SCUCS was collecting donations at the time, however, more recent documentation in the record indicates that SCUCS sought token donations from patrons of its service.

At the end of 1992, a bill was sponsored to exclude special paratransit vehicles from Department of Transportation (DOT) regulation. The bill excluded "special paratransit vehicles" from the term autobus as defined by N.J.S.A. 48:4-1. A "special paratransit vehicle" is defined as:

> any motor vehicle which is used exclusively for the transportation of persons who are at least 60 years of age or who have disabilities or who are the clients of social service agencies, provided, that the motor vehicle is used in a service provided by a county either directly or by contract, or provided by a non-profit organization, and the service is included by a county as part of its county plan required by section 6 of [the Senior Citizen and Disabled Resident Transportation Act], regardless of whether a fare is charged or donations accepted.
>
> [L. 1992, c. 192, § 2 (codified at N.J.S.A. 48:4-1).]

Importantly, the introductory phrase of N.J.S.A 48:4-1 which was reenacted as part of the bill continued to indicate "[t]he term 'autobus' as used in this chapter means . . ." Moreover, the sub-definition of "special paratransit vehicle" separately indicates "as used in this chapter." Thus, the definitions only apply to Chapter 4 of Title 48. Limited by their own terms to a particular chapter in Title 48 (Public Utilities), it would be quite a stretch for the definitions of autobus and special paratransit vehicle to now reach into the motor fuel tax provisions of Title 54 (Taxation).

Notably, the 1992 enactment also amends Title 17 (Insurance) to specifically exempt buses providing paratransit services from certain insurance provisions. L. 1992, c. 192, § 1 (codified as N.J.S.A. 17:28-1.5). The definition of special

-24-

paratransit vehicle from Title 48 is specifically incorporated into the relevant section in Title 17. N.J.S.A. 17:28-1.5 ("Any special paratransit vehicle as defined in R.S. 48:4-1"). By comparison, no definition from Title 48, autobus, special paratransit vehicle or otherwise, is incorporated into Title 54 as part of the 1992 enactment.

Neither the express words of the 1992 enactment, nor anything in the legislative history indicates an intent that this definitional change of autobus in N.J.S.A. 48:4-1 is intended to apply to the motor fuel tax exemption in Title 54. The clear legislative purpose of this act is to relieve the counties and third-party providers of the financial expense that would flow from DOT regulation. There is not any indication that the Legislature intends to impose the additional financial expense of the Motor Fuel Tax.

F.

Over the years, the Legislature incorporated a number of terms from Title 48 into the Motor Fuel Tax exemption statute. These incorporated terms have included:

> franchise tax . . . under the provisions of . . . [N.J.S.A.] 48:16-25. [L. 1937, c. 188.]

> franchise tax . . . under the provisions of [N.J.S.A.] 48:4-14, 48:14-15 and 48:14-16. [L. 1937, c. 188]

> operating authority conferred pursuant to [N.J.S.A.] 48:4-3. [L. 1972, c. 211, § 3.]

> charter bus operations or special bus operations as defined in [N.J.S.A.] 48:4-1. [L. 1985, c. 207, § 2.]

> buses operated for the transportation of enrolled children and adults referred to in subsection c. of [N.J.S.A.] 48:4-1. [L. 1985, c. 207, § 2.]

> regular route bus operation as defined by [N.J.S.A.] 48:4-1. [L. 1987, c. 445, § 5.]

At no time did the Legislature indicate any statutory definition of autobus found in Title 48 is incorporated into the fuel tax exemptions. Rather, in the first and second exemptions, jitney service and regular route service, the type of service "being operated" is defined by statute, not a description of the bus (i.e. autobus) providing the service. N.J.S.A. 54:39-112(a)(1). To now incorporate any statutory definition of autobus from Title 48 (Public Utilities) into the fuel tax exemption provisions of Title 54 (Taxation) is certainly not contemplated by the Legislature. The Legislature could have simply stated "autobus as defined by N.J.S.A. 48:4-1." It did not. To now imply otherwise cuts against the expressed intent of the legislative amendments over the years.

G.

The Motor Fuels <u>Use</u> Tax Act was also amended to include the exemptions added by Chapter 207. L. 1985, c. 207, § 3. The use tax allows the State to capture taxes on every gallon of fuel purchased outside the State, but used in the State. N.J.S.A. 54:39A-3. Only users of statutory defined qualified vehicles are subject to the use tax. N.J.S.A. 54:39A-2(b). New Jersey is a party to the International Fuel Tax Agreement (IFTA) which includes the 48 contiguous states as well as 10

-26-

Canadian provinces. May Trucking Co. v. Or. DOT, 388 F.3d 1261, 1263 (9th Cir. 2004). A user is required to periodically report to New Jersey the fuel used and purchased in each participating jurisdiction and pay any outstanding tax due to any state or province through one filing with New Jersey. N.J.S.A. 54:39A-4, -5, -6, -24. N.J.A.C. 13:18-3.9. A user is entitled to a credit, if applicable, for fuel purchased in one state or province and used in another, as well as fuel purchased and used in the same state or province. N.J.S.A. 54:39A-8. N.J.A.C. 13:18-3.10. New Jersey distributes the appropriate amounts of tax owed to each IFTA member jurisdiction. N.J.S.A. 54:39A-29. See generally N.J.A.C. 13:18-3.1. For fuel used in New Jersey, the Motor Fuel Use Tax is an amount equal to the sum of the Motor Fuel Tax and the Petroleum Products Gross Receipts Tax. N.J.S.A. 54:39A-29(f).

As to the Motor Fuels Use Tax Act, the special and rural exemption put in place by Chapter 207 makes no mention of autobus. Instead, the exemption states:

> Exempt vehicle means . . . (6) [v]ehicles operated by a public utility as defined in R.S.48:2-13, or under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation pursuant to P.L.1979, c.150 (C.27:25-1 et seq.) whose operations are limited to the State of New Jersey, or vehicles providing commuter bus service which receive or discharge passengers in New Jersey.
>
> [N.J.S.A. 54:39A-2(c). L. 1985, c. 207, § 3.]

The Motor Fuel Tax exemption refers to "autobus" and the Motor Fuel Use Tax refers to "vehicle." It is readily apparent that the Legislature is seeking to exempt the same type of bus service from fuel taxes. Specific to this case, special or rural transportation services would be exempt from taxation whether imposed directly at the pump through the Motor Fuel Tax and refunded, or excepted from the apportionment reporting scheme required under the Motor Fuel Use Tax. The Motor Fuel Use Tax is part of an integrated system to ensure that revenues representing the Motor Fuel Tax and Petroleum Products Gross Receipts Tax are collected directly at the pump or indirectly through the Motor Fuel Use Tax reporting requirements. Neither the plain words of the statute, nor the legislative history, reveals that the Legislature intends that the special and rural transportation fuel tax exemption applies differently based upon the type of fuel tax at issue.

H.

Finally, the Director rearranges and reparses the conjunctions for an alternate reading of the exemption as follows: "autobuses while being operated over the highways of this state in regular route bus operation . . . while . . . under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation . . ." The problem with this argument is that special transportation service is not regular route service. Regular route service is generally defined as transportation that occurs between fixed termini at regular

-28-

times.  See N.J.S.A. 48:4-1.  Special transportation consists of picking up seniors and taking them to doctor's appointments and shopping which by its very nature is not regular.  "Legislative language must not, if reasonably avoidable, be found to be inoperative, superfluous or meaningless." Spade v. Select Comfort Corp., 232 N.J. 504, 522 (2018) (quoting Carter v. Doe (In re N.J. Fireman's Ass'n Obligation), 230 N.J. 258, 274 (2017)).  If the words "regular route" were part of the special transportation services exemption, Chapter 207 would be rendered inoperative, at least in part.  In adopting Chapter 207, the Legislature certainly did not intend a reading which would render Chapter 207 inoperative.

The overarching goal is to implement the will of the Legislature.  Based upon the language of the statute as more fully illuminated by the legislative history, SCUCS qualifies for the exemption from the Motor Fuel Tax while providing special and rural transportation services.

III.

A.

The parties also disagree whether SCUCS is entitled to a refund of the Petroleum Products Gross Receipts Tax (PPGRT).  The statute was amended at various times to include certain exemptions and there is some disagreement as to how the provisions are to be construed.  The Director contends that the statute requires SCUCS to have one-year fuel contracts and provide certain documentation

to obtain any exemption and that SCUCS has not satisfied this requirement. SCUCS disputes the Director's interpretation of the law and the facts. With a number of amendments over the years, the PPGRT is also not a model of clarity when read without considering the impact of each amendment. However, parsing through the legislative amendments plainly reveals that SCUCS is entitled to a refund of the PPGRT on the same basis as the Motor Fuel Tax.

In 1990, the Legislature enacted the PPGRT. N.J.S.A. 54:15B-1 to 54:15B-8. L. 1990, c. 42. The tax is imposed on each company engaged in the refining or distribution of petroleum products. L. 1990, c. 42, § 3. N.J.S.A. 54:15B-3. The initial rate of the tax was 2.75% of gross receipts derived from the first sale of a petroleum product in the state. Id. A later amendment provided that if the first sale is motor fuel, the tax is converted to a cents per gallon rate which is adjusted semiannually by the Director. L. 1991, c. 181, § 2. N.J.S.A. 54:15B-3. While the tax is paid by the refiner or distributor, the effects of the tax may be certainly passed on to buyers or others down the distribution chain.

The law was amended in 1991 to exempt sales to the federal government from the tax. L. 1991, c. 19, § 1. N.J.S.A. 54:15B-5. However, if the federal government is not the first in-state purchaser (e.g. motor fuel purchased by the federal government at the retail level), the federal government can seek reimbursement equivalent to the amount of tax paid. L. 1991, c. 19, §3(a). N.J.S.A. 54:15B-10.

The legislation provides the procedure to be followed for the federal government to obtain the reimbursement. L. 1991, c. 19, 3(b), 3(c), 4. N.J.S.A. 54:15B-10(b), -10(c), -11.

The law was amended a second time in 1991 to exempt sales to non-profits pursuant to a written contract extending one year or longer. L. 1991, c. 181, §1, N.J.S.A. 54:15B-2. The amendment explicitly provides the seller must provide the same type of documentation as provided for sales to the federal government. Ibid.

The parties have gone back-and-forth primarily on the issue of whether SCUCS has the type of one-year contract contemplated by the statute. SCUCS asserts it purchased motor fuel from three different retail vendors on an as needed basis under one-year or credit card contracts. The Director asserts that these are not actually one-year contracts but merely accounts that are billed monthly and SCUCS has not provided proof from the sellers as required under the provisions governing reimbursement. N.J.S.A. 54:15B-2, -10(b). The court need not decside the applicability or parameters of the non-profit exemption since a later amendment provides a separate basis for relief to the taxpayer.

B.

In 2016, the PPGRT significantly increased as part of an effort to provide funding for transportation infrastructure. S. Budget & Appropriations Comm. Statement to A. 12 3 (July 29, 2016). For highway fuel, the rate went from 2.75%

-31-

to a base rate of 12.85%.[19]  L. 2016, c. 57, § 14.  N.J.S.A. 54:15B-3(a)(1).  With this increase in the tax, the Legislature exempts the same entities which are also exempt from the Motor Fuel Tax.  L. 2016, c. 57, §13, N.J.S.A. 54:15B-2.1(b).  The language for the Motor Fuel Tax exemption categories found at N.J.S.A. 54:39-112 (formerly N.J.S.A. 54:39-66) is copied verbatim into the PPGRT.  Ibid.

The bus service exemptions, now part of PPGRT, are as follows:

> autobuses while being operated over the highways of this State in those municipalities to which the operator has paid a monthly franchise tax for the use of the streets therein under the provisions of R.S. 48:16-25 and autobuses while being operated over the highways of this State in a regular route bus operation as defined in R.S. 48:4-1 and under operating authority conferred pursuant to R.S. 48:4-3, or while providing bus service under a contract with the New Jersey Transit Corporation or under a contract with a county for special or rural transportation bus service subject to the jurisdiction of the New Jersey Transit Corporation pursuant to P.L. 1979, c. 150 (C. 27:25-1 et. seq.), and autobuses providing commuter bus service which receive or discharge passengers in New Jersey.  For purposes of this paragraph "commuter bus service" means regularly scheduled passenger service provided by motor vehicles within or across the geographical boundaries of New Jersey and utilized by passengers using reduced fare, multiple ride, or commutation tickets and shall not include charter bus operations for the transportation of enrolled children and adults referred to in subsection c. of R.S. 48:4-1 and "regular route service" does not mean regular route in the nature of special bus operation or casino bus operation.

---

[19]  The rate is adjusted annually based upon prior revenues.  N.J.S.A. 54:15B-3(c). Other petroleum products increased to 7%.  N.J.S.A. 54:15B-3(a)(1).

[N.J.S.A. 54:15B-2.1(b)(1)].

Since this is the exact same language utilized in the Motor Fuel Tax Act, the taxpayer qualifies for exemption from PPGRT in the same way it is exempt under the Motor Fuel Tax. Obviously, when the Legislature uses the same exact exemption language for a different tax on the same product, it is quite apparent that the interpretation of the exemption language from the prior tax is applicable. See State v. Fleischman, 189 N.J. 539, 552 (2007).

The lead-in to the PPGRT exemptions provides that "a refund of the [PPGRT] may be claimed by the consumer providing proof the tax has been paid and no refund has been previously issued . . . ." N.J.S.A. 54:15B-2.1(b). This is identical to the preface of the motor fuel tax exemption that provides "a refund of [the Motor Fuel Tax] may be claimed by the consumer providing proof the tax has been paid and no refund has been previously issued . . . ." N.J.S.A. 54:39-112(a). There is hardly any dispute that the taxpayer here is the consumer of the highway fuel and qualifies under the bus service exemption provisions. Identical refund language for the identical commodity signals the legislative intention to implement a refund procedure based upon the same standard and proofs. See Fleischman, 189 N.J. at 552. To suggest otherwise would not be in keeping with the intent expressed by the Legislature through the language it used.

## IV.

Overall, this case demonstrates the importance of reviewing the legislative history, regardless of the complexity or the topics. Here, the complex areas of taxation and public utilities regulation intersect. A full understanding of what the Legislature sought to accomplish in this matter is impossible to discern without reviewing the history and context of the legislative enactments in both areas of the law. Upon a thorough review of both areas of the law and the legislative intent, the court finds that the special and rural transportation services provided by SCUCS are eligible for the Motor Fuel Tax and the Petroleum Products Gross Receipts Tax exemption.

For the foregoing reasons, SCUCS is eligible for a refund of the Motor Fuel Tax and the Petroleum Products Gross Receipts Tax paid. An order will follow.